[No. H036597. Sixth Dist. Jan. 24, 2013.]

JOHN McGRORY, Plaintiff and Appellant, v.
APPLIED SIGNAL TECHNOLOGY, INC., Defendant and Respondent.

COUNSEL

Kraw & Kraw Law Group, Korda, Johnson & Wall and Michael J. Korda for Plaintiff and Appellant.

John R. Shuman, Jr., and Amy E. Beckstead for Defendant and Respondent.

OPINION

**RUSHING, P. J.—**

## I. INTRODUCTION

Defendant Applied Signal Technology, Inc. (Employer), terminated its four-year employment of plaintiff John McGrory (Employee) in June 2009 after an outside investigator retained by Employer concluded that, while Employee had not discriminated against a lesbian subordinate on the basis of her sex or sexual orientation, in other ways Employee had violated Employer's policies on sexual harassment and business and personal ethics and he had been uncooperative and deceptive during the investigation.

As an at-will employee, Employee was subject to termination by Employer for no reason or almost any reason (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*)), except for a reason that violates a fundamental public policy recognized in a constitutional or statutory provision. (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170, 172–174 [164 Cal.Rptr. 839, 610 P.2d 1330]; *Green v. Ralee Engineering*

*Co.* (1998) 19 Cal.4th 66, 79 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) Public policy, expressed in part in the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA), prohibits employment discrimination on the basis of sex. (Gov. Code, § 12940,[1] *Rojo v. Kliger* (1990) 52 Cal.3d 65, 91 [276 Cal.Rptr. 130, 801 P.2d 373]; see *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*).)

In this case, Employee alleged that his termination violated four public policies. An employee cannot be terminated for (1) being male, (2) participating in an employer's internal investigation, or (3) trying to protect the confidentiality and privacy of coworkers. (4) A termination for misconduct must be preceded by notice and a hearing and honest findings of misconduct. As we will explain, he has abandoned these latter two claims on appeal. He further alleged that he was defamed when Employer's vice-president of human resources told another employee why Employee was terminated.

Employer filed an alternative motion for summary judgment or summary adjudication (Code Civ. Proc., § 437c),[2] asserting that there was no evidence that Employee was terminated for an impermissible reason and that Employer could not be liable in defamation for privileged statements of opinion on a topic of mutual interest. Over Employee's opposition, the trial court granted summary judgment, concluding that Employer's motion had established "a legitimate, non-discriminatory reason for terminating" Employee, Employee had "failed to meet his burden of showing substantial evidence that [Employer's] stated reasons for the adverse action were untrue or pretextual, such that a reasonable trier of fact could conclude that [Employer] engaged in discrimination," and Employer had established "that the allegedly slanderous statements are privileged."

On appeal, Employee claims that he has presented triable issues of fact regarding Employer's true motivation for terminating him and that Employer's statements about him to coworkers were not conditionally privileged because they lacked reasonable grounds. For the reasons stated below, we will affirm the judgment after concluding that there is no evidence warranting a reasonable inference that Employee was actually terminated for being male, that being uncooperative or deceptive in an employer's internal investigation is

---

[1] When Employee was terminated in June 2009, Government Code former section 12940, subdivision (a) prohibited an employer from discriminating against an employee because of "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation." (Stats. 2003, ch. 671, § 1, p. 5155.)

[2] Unspecified section references are to the Code of Civil Procedure.

not a protected activity under state or federal law, and that Employer's statements to its employees about Employee's termination were conditionally privileged.

## II. The Complaint

The unverified first amended complaint filed on June 4, 2010, alleged the following facts. Employee worked for Employer from July 6, 2005, until his termination on June 23, 2009. He was hired as a section manager and promoted to department manager, reporting directly to Employer's chief financial officer (CFO), James Doyle. In turn, a dozen employees reported directly to Employee.

What precipitated Employee's termination was a complaint against him lodged with Employer's human resources department (HR) by Dana Thomas, a female who reported to him. As her supervisor, Employee, in consultation with HR, had given Thomas a documented verbal warning in late 2008 for poor work performance and a written performance improvement plan (PIP) in 2009. In late May 2009, instead of signing the PIP, Thomas lodged her complaint accusing Employee of discriminating against her on the bases of gender and sexual orientation, but not sexual harassment.

This accusation led to an investigation of Employee by a female outside attorney, Sejal Mistry. Mistry interviewed Employee and many of his subordinates, including Curt Oliver. Oliver and Employee disliked Mistry's interview style and considered her to be biased and confrontational. She told Employee that "she was going to have problems with him because of his expressive face." Employer refused to provide Employee before his interview with either Thomas's eight-page complaint or a summary of the charges against him.

Mistry's report to Employer, dated June 16, 2009, exonerated Employee of charges of discrimination based on gender and sexual orientation and found that Thomas had work performance problems. However, she found that both Employee and Oliver had been uncooperative and untruthful during her investigation. In fact, Oliver and Employee had told the truth, though Employee had refused to answer two questions—regarding how he ranked his subordinates and who had complained about Thomas—based on his concern for the privacy and confidentiality of coworkers.

As a result of this report, Employer terminated Employee on June 23, 2009, and disciplined Oliver one day later. Employee was terminated at a meeting with Employer's male CFO, Doyle, and Mike Forcht, male vice-president of HR. When Employee asked why he was being terminated, Doyle

said it "was not based on his conduct relating to Thomas, but rather because he had been uncooperative during the investigation and that he had made 'factual denials' during the investigation." When Employee asked for the details, Forcht refused to elaborate.

In response to the same question by one of Employee's coworkers, Forcht answered that Employee was terminated after several warnings for not cooperating with the investigation.

Thomas was allowed to continue working with Employer until she received a generous retirement package at the end of 2009.

The complaint predicated three causes of action on the above conduct. First, based on disparate treatment of male Employee and his male subordinate, Oliver, and his female subordinate, Thomas, plaintiff alleged that his termination resulted from gender discrimination by Employer. Second, his termination violated several public policies, namely policies protecting the privacy and confidentiality of coworkers, precluding retaliation for statements made during an internal investigation, and guaranteeing employees notice of adverse charges and an unbiased investigator. The complaint cited cases that purportedly establish these policies. Third, the reasons given by HR to third parties for Employee's termination were slanderous.

### III. MATERIAL FACTS

Employer's summary judgment motion asserted that there were 28 separate facts that were both undisputed and material. Employee's response conceded that 10 facts were undisputed, but asserted that six of these were immaterial. In setting out the facts we regard as material, we will note those that Employee has disputed.

### A. The Complaint Against Employee

Employee accepted a written job offer from Employer dated June 28, 2005. The offer contained the following sentence. "I understand and agree that my employment with [Employer] is at-will, and that my employment is therefore for an unspecified period of time and may be terminated at any time, with or without good cause, and with or without advance notice, by [Employer] or by me."[3]

---

[3] Employee purported to dispute that he is an at-will employee by asserting that it is a statement of law and not a material fact and that he could not be terminated in violation of public policy. The terms of his employment contract, however, are matters of fact with legal significance.

As manager of Employer's contracts/pricing department, Employee supervised about a dozen subordinates, including a contract administrator named Dana Thomas. As her manager, he presented her with a PIP in late May 2009. Thomas's response to the PIP was to complain about Employee orally and in writing to Michael Forcht, Employer's vice-president of HR. In short, she believed her work performance did not merit a PIP, and that his increasing "[m]icromanagement" and criticism of her work performance could only be explained by "sexual orientation and/or gender discrimination and harassment" of her as an openly gay female who had announced to her coworkers in an e-mail on November 10, 2008, that she had gotten married despite Proposition 8. In addition to Employee's criticism of her work and abilities, Thomas claimed she had witnessed Employee "telling off-color jokes in the presence of groups, that demonstrate his lack of good judgment and sensitivity to those of other cultures."[4]

### B. *The Investigator's Conclusions*

Through outside counsel, Employer retained an employment attorney, Sejal Mistry, to investigate Thomas's complaint. Mistry interviewed Employee and a number of his subordinates and coworkers before issuing a 13-page report dated June 16, 2009. Among the subordinates were three female contracts administrators, including Thomas and Kathy Bosza, and two male contracts administrators, Curt Oliver, Sr., and Dennis Backens.

According to Employee's declaration, HR vice-president Forcht told him that Employer was investigating a complaint by Thomas. "The only direction [Employee] was given by Mr. Forcht was to cooperate in the investigation." Forcht refused his requests for either a summary of the allegations against him or a copy of the complaint. During Employee's two-hour interview with Mistry, she was "rude, condescending" and seemed to have "reached a conclusion about [Employee] before" talking to him.

Mistry's report reached the following conclusions. As to Thomas, Employee "did not discriminate against Thomas on the basis of her sexual orientation"

---

[4] A major premise of Employee's action is based on a fundamental misunderstanding or misreading of Thomas's eight-page single-spaced e-mail complaint dated June 1, 2009. Employee's unverified complaint alleged that Thomas did not complain of sexual harassment. His opposition to the summary judgment motion disputed that she complained of sexual harassment. On appeal he goes so far as to assert it to be "an undisputed fact that Dana Thomas never lodged a complaint against [Employee] for sexual harassment" and "Nowhere in her eight page complaint does she accuse [Employee] of sexual harassment."

We agree with Employer that this is "revisionist history." We have quoted from the third paragraph on the first printed page of her e-mail to show that she specifically claimed discrimination and harassment based on sexual orientation or gender. She also used variations on the word "harass" twice more in her e-mail.

and he "did not discriminate against Thomas on the basis of her gender." There were legitimate concerns about Thomas's work performance. Thomas was taking more time off than fellow employees and was not meeting performance expectations. Employee was evenhanded in terms of sex in criticizing and praising subordinates for their work. "Thomas does appear to have a distorted view of her work performance," though she was credible in describing Employee's behavior.

However, Employee had "violated [Employer's] policies on Sexual Harassment and Business/Personal Ethics, both of which prohibit making jokes or remarks based on race or sex."[5] "Thomas and other witnesses reported that [Employee] has made comments or jokes of a sexual or racial nature on a regular basis." He readily admitted it to Mistry. He told her a couple of the jokes, one of which made fun of the accent and English-speaking abilities of an East Indian man, another of which make vulgar references to a woman's breasts and a man's penis. He continued to make such jokes though a female subordinate, Kathy Bosza, had expressed discomfort with them. Employee admitted that he and other men in his department went into an office during and after office hours to tell jokes. He indicated that he thought this complied with Employer's policies as females were not present. One female subordinate asked a male subordinate when she would be admitted to " 'the dirty old bastards club.' " Curt Oliver also made jokes at the expense of ethnic groups. Employee told his subordinates that his wife buys him a Playboy magazine four times a year.

Mistry concluded that Employee was forthcoming about some of his conduct, but "he was uncooperative and appeared to have intentionally

---

[5] Employee cannot dispute that Mistry reached this conclusion, but he does purport to dispute its accuracy.

Based on his misreading of Thomas's complaint as not involving sexual harassment, Employee claims to be mystified about why Mistry looked into the issue of harassment and he asserts that "Mistry's investigation cleared [Employee] of the charges levied against him." We have already explained that Thomas did accuse him of harassment based on sex and sexual orientation. Our quotation of Mistry's conclusions refutes the claim that she cleared him of all charges.

In maintaining that Thomas did not accuse him of sexual harassment, Employee may mean that, while Thomas used that phrase, she did not describe the kind of sexual harassment that violates the FEHA. He argues that his "actions are not even close to those which would constitute a hostile working environment." "[T]he prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 461 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*); see *Lyle, supra*, 38 Cal.4th 264, 277.)

We question the relevance of this contention. Mistry did not conclude that Employee violated the FEHA, just that he violated Employer's written policies on sexual harassment and ethics. Curiously, these policies are not part of the record on appeal.

misrepresented some facts during the course of the investigation." Citing concern for privacy, he refused to disclose his written rankings of subordinates and the identities of people who had complained about Thomas.[6] He denied making many of the statements that Thomas quoted, though other witnesses confirmed that he had made similar statements. Employee denied that e-mail protocol was on the agenda of a staff meeting after Thomas's e-mail announcement of her wedding, but Thomas produced an agenda with staff e-mail as an item.[7] Employee spoke derisively of political correctness.

Mistry found that other witnesses were generally credible except for Curt Oliver, whose answers were evasive and defensive. Unlike every other witness, he denied that Employee had discussed Playboy magazines.

Mistry concluded that termination of Employee was justified, as Employee's conduct was unacceptable for a manager of his level and experience, and he seemed unwilling to acknowledge misconduct or reform his behavior. Alternatively, Employer could impose lesser discipline such as suspension without pay for one month, denial of a bonus, monitoring of Employee's performance review meetings by HR personnel, and required participation in a management skills class.

Mistry recommended that Curt Oliver receive a written warning for his intentional misrepresentations to her and that Thomas be informed by HR and management about her performance deficiencies.

Employee cannot dispute that Mistry's report contains the above statements, but he does dispute the accuracy of Mistry's conclusions.

### C. *The Adverse Employment Actions*

According to a declaration by Michael Forcht, Employer's vice-president of HR, he, Bill Van Vleet, Employer's chief executive officer, and Jim Doyle,

---

[6] According to Employee's declaration, the only question he refused to answer was when Mistry asked for his rankings of his subordinates. He told her they were confidential and sensitive and that she should ask his manager, Jim Doyle, or Mike Forcht in HR for them.

[7] According to Employee's declaration, he told Mistry that Thomas's marriage announcement e-mail was not specifically discussed at a staff meeting, but that he periodically reminded his staff at meetings "that e mails 'were forever' and that 'what one person finds funny or interesting in an e mail may be offensive to others.' " At Mistry's request, he searched his computer for meeting agendas right after November 2008 and he informed her by e-mail that he could not find one listing e-mail as an agenda item. In fact, there was such an agenda item for a meeting on November 13, 2008, just three days after Thomas's wedding announcement, stating: " 'E-mails; caution what is funny or interesting to someone may be offensive to others; also remember e-mails are forever.' " It is remarkable Employee was able to quote virtually verbatim during a June 2009 interview the text of an e-mail from November 2008 that he could not recall sending.

Employer's CFO, discussed how to respond to Mistry's report at several meetings over several days. They considered her recommendations as well as the alternative of demoting Employee. "At the end of our discussions, we decided to terminate Plaintiff. Our decision was based upon: (a) Ms. Mistry's finding that [Employee] had violated [Employer's] Sexual Harassment and Business/Personal Ethics policies; (b) Ms. Mistry's finding that [Employee] had been untruthful during her investigation and did not participate in the investigation good faith [sic]; and (c) our concern that [Employee's] behavior (as well as the conclusions reached about him by Ms. Mistry in the Report) exposed the Company to a risk of future legal liability based on claims that might be made by Ms. Thomas and/or other female employees." Employer terminated Employee on June 23, 2009. A male was selected to take Employee's position.

Employee disputes that he was terminated for these reasons. According to Employee's declaration, he was terminated on June 23, 2009, at a meeting with Forcht and his supervisor, Doyle. Doyle told him "that the investigator had found that [Employee] had used foul language and made some inappropriate comments and jokes but that wasn't the reason [he] was terminated, as he (Doyle) had been guilty of the same conduct. He specifically told me there were only two reasons for my termination were: [sic] 1. that [Employee] was uncooperative during the investigation and, 2. that [Employee] had made 'factual denials' during the course of the investigation (presumably [Employer] thought [he] was lying although Doyle used those words)." When Employee asked for details, Forcht said that Employer was unable to divulge that information.

On June 24, 2009, Oliver received a written warning from CFO Doyle regarding his intentional misrepresentations to the investigator and his racial and sexual joking in the workplace. The following day, Oliver submitted a written rebuttal disputing Mistry's conclusion that he had intentionally misrepresented facts to her. He claimed that he honestly failed to recall Employee mentioning Playboy magazine. Despite his honesty, she accused him of lying and defending Employee. He considered her investigation "to be geared towards a conclusion that she had already formulated, rather than being an unbiased, professional fact-finding effort."

Dana Thomas remained subject to the PIP prepared by Employee under new managers until August 13, 2009, when she was recognized to have met her objectives. Following an annual performance appraisal meeting on October 14, 2009, Thomas was demoted, to which she objected. She contacted an attorney who wrote Employer on November 19, 2009, that not only was Employer continuing to discriminate against her, but coworkers were retaliating against her for causing Employee's termination. As evidence of discrimination, the letter listed five pages of conduct by Employee. Thomas resigned

her employment with Employer in early December 2009. Employer eventually agreed to a mutual release of all claims and a payment of about $90,000.[8]

### D. *Conversations with Irene Chen*

According to Forcht's declaration, Irene Chen, one of Employee's subordinates, talked to Forcht privately in his office a day or two after Employee's termination. Forcht, as Employer's HR vice-president, sought to allay her concern that she was responsible for Employee's termination. Forcht does not "harbor any ill-will, hatred, or malice toward" Employee.

According to Chen's deposition, she asked Forcht if there was any other possible outcome than terminating Employee. She did not recall Forcht's exact words, but he indicated it was the only possible outcome. She asked if Employee had enough warning before he was fired. Forcht said he did. She had heard that one of the reasons for Employee's firing was his lack of cooperation during the investigation. She asked Forcht if Employee knew that he would get fired for not cooperating. Forcht replied that he should have known.

According to Employee's declaration, he met Chen and another coworker for lunch three or four days after he was terminated. Chen indicated to him that Forcht told her that his "termination was preceded by a warning, that a manager should not have to be warned and that [Employee] had brought the termination upon [himself] because he was uncooperative during the investigation." In reality, Employee was not uncooperative and "had never been warned about any of [his] conduct at [Employer] at any time before [his] termination."

### IV. STANDARD OF REVIEW OF A SUMMARY JUDGMENT

A defendant seeking summary judgment "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of

---

[8] We find these facts about Dana Thomas in excerpts from the deposition of Michael Forcht and a letter dated November 19, 2009, from an attorney representing Thomas. Both documents were attached to a declaration by Employer's counsel in support of the summary judgment motion, though neither attachment was cited by Employer to establish a material, undisputed fact or by Employee to create a triable issue.

Without citing these documents, Employee's opposition to the summary judgment motion and his opening brief present a version of the facts contending that Thomas was "ultimately rewarded with a $75,000.00 exit package in December 2009."

action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (§ 437c, subd. (p)(2).) A summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court . . . ." (§ 437c, subd. (c).)

Because entitlement to a summary judgment presents questions of law, on appeal we independently review all the evidence set forth in the motion and opposition except that to which an objection was expressly sustained. (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 101 [134 Cal.Rptr.3d 622]; *Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 950–951 [139 Cal.Rptr.3d 464].)[9]

## V. THE WRONGFUL TERMINATION CLAIMS

### A. *Defendant's Showing*

As this court has repeatedly explained in cases alleging wrongful termination, regardless of who bears the burden of proof at trial, a plaintiff opposing a summary judgment has no obligation to produce evidence until the moving defendant has established either the existence of a complete defense or the absence of an essential element of the plaintiff's claim. (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1730–1731 [35 Cal.Rptr.2d 181]; *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 613 [88 Cal.Rptr.2d 239] (*Nelson*); *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 107 [16 Cal.Rptr.3d 717]; *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 [73 Cal.Rptr.3d 240] (*Hicks*).) Accordingly, we disregard the parties' dispute about whether Employee has established a prima facie showing of discrimination, an evidentiary threshold that would be applicable at trial. (*Martin v. Lockheed Missiles & Space Co., supra,* 29 Cal.App.4th 1718, 1730; *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 215–216 [51 Cal.Rptr.2d 642]; *Nelson, supra,* 74 Cal.App.4th 597, 613.)

---

[9] Employer made one evidentiary objection to Employee's showing, namely that his declaration's quotation of Irene Chen was hearsay. As the trial court did not expressly rule on this objection, it is preserved on appeal. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 531 [113 Cal.Rptr.3d 327, 235 P.3d 988].)

■ The ultimate issue when discriminatory discharge is alleged is what the employer's true reasons were for terminating the employee. (*Guz, supra,* 24 Cal.4th 317, 358 ["the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*"]; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715 [81 Cal.Rptr.3d 406] (*Mamou*) ["The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus."].) As indicated above, an employer need not have good cause to terminate an at-will employee. The reason for termination need not be wise or correct so long as it is not grounded on a prohibited bias. (*Guz, supra,* 24 Cal.4th 317, 358.)[10]

An employer's burden can be met by producing evidence of one or more reasons for the adverse employment action that were "unrelated to unlawful discrimination." (*Hicks, supra,* 160 Cal.App.4th 994, 1003; cf. *Guz, supra,* 24 Cal.4th 317, 360.)[11]

In this case, it does not appear that Employer provided Employee with a written statement of reasons for his termination, but they have been articulated by Employer's HR vice-president, Forcht, in a declaration filed in support of Employer's motion for summary judgment. First, Employee violated Employer's policies on sexual harassment and business and personal

---

[10] Relying on *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412] (*Cotran*), Employee's complaint alleged that all employees are entitled to notice and a fair hearing prior to being terminated for misconduct. That was not what the California Supreme Court held in that opinion. The court explained: "We granted review to clarify the role of the jury in litigation *alleging breach of an implied contract not to terminate employment except for good or just cause,* and to resolve the conflict among the Courts of Appeal. The better reasoned view, we conclude, prescribes the jury's role as deciding whether the employer acted with ' "a fair and honest cause or reason, regulated by good faith." ' " (*Id.* at pp. 95–96, italics added.)

As Employer pointed out in its motion for summary judgment, no cause is needed to terminate an at-will employee, so *Cotran* is inapplicable. We deem this public policy argument to have been abandoned by Employee, as he did not contest this distinction in the trial court and he does not do so on appeal. (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 978–979 [118 Cal.Rptr.3d 34].)

[11] A trial court has discretion to deny a summary judgment when an employer's declaration is the sole evidence of his or her state of mind.

Section 437c, subdivision (e) states: "If a party is otherwise entitled to a summary judgment pursuant to this section, summary judgment may not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court, where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact; or where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof."

ethics. Second, he was untruthful and uncooperative with the investigator. Third, there was a concern that his behavior might create future legal liability for Employer. We will examine Employee's response to each reason in turn.

### 1. *Employee's Violation of Employer's Policies*

Employee does not contend that he could not have been terminated if he had violated Employer's policies on sexual harassment and business and personal ethics. He instead contends that this reason was false, because neither Thomas nor anyone else ever complained about sexual harassment by Employee. We have already explained above (*ante*, fn. 4) that this assertion is itself false, as Thomas complained of sexual harassment.

He contends that, according to what CFO Doyle said to him, he was not terminated for this reason. We defer considering this contention until we take a look at Employee's opposition to the motion below. We also defer consideration of Employee's contention that the stated reason was not Employer's true motivation.

### 2. *Employee's Misconduct During the Investigation*

Employee argues that the second reason for his termination violates public policy. "The public policy of California is to shield anyone participating in an investigation of discrimination from the possibility of retaliation," presumably even if the participant is uncooperative and untruthful.

Employee invokes Government Code section 12940, part of the FEHA, which makes it an unlawful employment practice "(h) For any employer . . . to discharge, expel, or otherwise discriminate against any person *because the person has* opposed any practices forbidden under this part or because the person has filed a complaint, *testified, or assisted in any proceeding under this part*." (Italics added.)

■ "This enactment aids enforcement of the FEHA and promotes communication and informal dispute resolution in the workplace. [Citation.] Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (*Miller, supra*, 36 Cal.4th 446, 472; cf. *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*).)

Employee assumes that Employer's internal investigation was a "proceeding under this part" and implies that his participation in the investigation was a protected activity for which he could not be terminated.

Section 7287.8, subdivision (a) of title 2 of the California Code of Regulations clarifies what kinds of proceedings are contemplated by Government Code section 12940, subdivision (h): "It is unlawful for an employer . . . to demote, suspend, reduce, . . . , adversely affect working conditions or otherwise deny any employment benefit to an individual because that individual . . . has filed a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing conducted by the [Fair Employment and Housing] Commission or Department [of Fair Employment and Housing] or their staffs. [¶] . . . [¶]

"(2) Assistance with or participation in the proceedings of the Commission or Department includes, but is not limited to:

"(A) Contacting, communicating with or participating in the proceedings of the Department or Commission due to a good faith belief that the Act has been violated; or

"(B) Involvement as a potential witness which an employer or other covered entity perceives as participation in an activity of the Department or the Commission."

Employee relies on *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241 [76 Cal.Rptr.3d 632], which concluded that an employee was engaged in a protected activity when she was a " 'potential witness' " in a Department of Fair Employment and Housing (DFEH) proceeding filed by a coworker. (*Id.* at p. 1252.) However, Employee does not assert that he participated as a witness or otherwise in an administrative investigation conducted by the DFEH.

We find no California state decision to have identified the limits of "any proceeding under this part" in Government Code section 12940, subdivision (h).

As the parties point out, title VII of the Civil Rights Act of 1964 (Pub.L. No. 88-352 (July 2, 1964) 78 Stat. 241) contains a comparable provision. Title 42 United States Code section 2000e-3(a) states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

■ "In interpreting California's FEHA, California courts often look for guidance to decisions construing federal antidiscrimination laws, including title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII). [Citation.] But federal court interpretations of Title VII are helpful in construing the FEHA only when the relevant language of the two laws is similar." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984 [104 Cal.Rptr.3d 710, 224 P.3d 41].)

Federal courts have determined that the activities protected by 42 United States Code section 2000e-3(a) are limited to participation in official administrative proceedings by the Equal Employment Opportunity Commission and do not extend to private internal investigations by employers. (*Vasconcelos v. Meese* (9th Cir. 1990) 907 F.2d 111, 113; *E.E.O.C. v. Total System Services, Inc.* (11th Cir. 2000) 221 F.3d 1171, 1174 (*Total System Services*); *Hatmaker v. Memorial Medical Center* (7th Cir. 2010) 619 F.3d 741, 746–747 (*Hatmaker*); *Townsend v. Benjamin Enterprises, Inc.* (2nd Cir. 2012) 679 F.3d 41, 49.)

Some federal courts have determined that the immunity for participating is limited to sincere participation. The participation immunity does not prohibit an employer from imposing discipline for an employee's misbehavior during an internal investigation, such as attempting to deceive the investigator. (Cf. *Vasconcelos v. Meese, supra*, 907 F.2d 111, 113.) "Lying in an internal investigation is disruptive of workplace discipline . . . ." (*Hatmaker, supra*, 619 F.3d 741, 746.) "[W]hether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department." (*Total System Services, supra*, 221 F.3d 1171, 1176.)

Similarly, while refusing to participate in or cooperate with an employer's discriminatory action may be a protected activity when it amounts to opposition to a forbidden practice (*Yanowitz, supra*, 36 Cal.4th 1028, 1047), refusing to participate in or cooperate with an investigation into a discrimination claim is not participation or assistance and is not a protected activity. (*Alack v. Beau Rivage Resorts, Inc.* (S.D.Miss. 2003) 286 F.Supp.2d 771, 775; *Bray v. Tenax Corp.* (E.D.N.C. 1995) 905 F.Supp. 324, 328.)

 We find these federal decisions to be eminently reasonable, and we conclude that Government Code section 12940, subdivision (h), does not shield an employee against termination or lesser discipline for either lying or withholding information during an employer's internal investigation of a discrimination claim.[12] In other words, public policy does not protect deceptive activity during an internal investigation. Such conduct is a legitimate reason to terminate an at-will employee.[13]

### 3. *Employer's Fear of Legal Liability*

Employee asserts that it is "absurd" for Employer to say that "it fired [Employee] to protect itself from legal risk."

We note that after Employee's termination, Employer was confronted with a claim by an attorney for Thomas that Employer had discriminated against her, based primarily on Employee's conduct. Employer's statement is not inherently incredible.

Employee also argues that his "relatively innocent behavior" could not justify "a sexual harassment claim." Employee provides no authority requiring an Employer to retain an at-will employee until his conduct creates civil liability.

Employee cites *Sassaman v. Gamache* (2nd Cir. 2009) 566 F.3d 307 for the proposition that "An employer may not, however, rely on its alleged fear of a lawsuit as a pretext for making an employment decision that violates Title VII." (*Id.* at p. 315.) The factual situation before that court was clarified in the following statement. "However, fear of a lawsuit does not justify an employer's reliance on sex stereotypes to resolve allegations of sexual harassment, discriminating against the accused employee in the process." (*Id.* at p. 313.) In that case the male employee had produced evidence of a statement by his employer that he probably had sexually harassed a female

---

[12] As Employee did not invoke his privilege against self-incrimination, we indicate no opinion on whether such conduct during an internal investigation might be privileged against a private employer's action.

[13] Employee's complaint cited *Yanowitz, supra,* 36 Cal.4th 1028 for the proposition that "trying to protect the confidentiality and privacy rights of his fellow employees" is a protected activity. Employer's motion asserted that neither *Yanowitz* nor the FEHA protects the confidentiality and privacy rights of coworkers. We deem this public policy argument to have been abandoned by Employee, as he did not contest this argument in the trial court nor does he on appeal.

coworker because he was male. (*Id.* at p. 311.) We agree with these quotations, but find them inapplicable. We see nothing in Employer's showing revealing that it relied on male stereotypes in terminating Employee.

Employee also argues that according to CFO Doyle, Employee was not terminated for this reason. We will defer considering this contention to our examination of Employee's opposition.

In reviewing Employer's showing, we are not concerned with the wisdom of the termination, just with whether Employer has proffered nondiscriminatory reasons. We conclude that Employer's summary judgment motion carried its burden of showing that Employee was terminated for three legitimate and nondiscriminatory reasons. We now consider Employee's opposition to see if he has created at least one triable issue of material facts.

### B. *Plaintiff's Showing*

As this court has explained, "If the employer has met its burden by showing a legitimate reason for its conduct, the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 [128 Cal.Rptr.2d 660] (*Cucuzza*); cf. *Nelson, supra,* 74 Cal.App.4th 597, 613–614.)

In *Mamou, supra,* 165 Cal.App.4th 686, this court stated, "evidence that the employer's claimed reason is false—such as that it conflicts with other evidence, or appears to have been contrived after the fact—will tend to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful." (*Id.* at p. 715, italics omitted.)

█ "There will seldom be 'eyewitness' testimony as to the employer's mental processes." (*U. S. Postal Service Bd. of Govs. v. Aikens* (1983) 460 U.S. 711, 716 [75 L.Ed.2d 403, 103 S.Ct. 1478].) "In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) Thus, even though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of

motive, a material triable controversy is not established unless the inference is reasonable." (*Cucuzza, supra*, 104 Cal.App.4th 1031, 1038.)[14]

While Employee's contentions are not so organized, we understand him to say that the pretextual basis for his termination appears from observing that (a) Employer gave conflicting explanations for terminating him and (b) the given reasons are unsubstantiated. We also understand him to say that discriminatory intent is manifest in (a) the biased manner of the investigator and (b) the disparate discipline resulting from the investigation. We will examine these contentions separately.

### 1. *Evidence of Pretext*

Employer presented three reasons for terminating Employee in a declaration by its HR vice-president, namely (1) violations of Employer's policies on sexual harassment and business and personal ethics, (2) uncooperative and deceitful responses to the investigator, and (3) concern about future legal liability. Forcht did not declare that each reason alone would have justified Employee's termination.

---

[14] *Cucuzza, supra*, 104 Cal.App.4th 1031 went on to state "an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 858 [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (*Id.* at p. 1038.) After stating this rule, *Cucuzza* went on to apply it, concluding that "no reasonable trier of fact could determine on these facts that City's refusal to hire plaintiff into the fleet assistant job was *more likely based* upon gender bias than it was upon the fact that [the female] plaintiff was less qualified than the [male] person City hired." (*Id.* at p. 1046, italics added.)

This case does not require us to determine the outcome when conflicting inferences are equally reasonable. We recognize that *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th 826 (*Aguilar*) included an extended discussion about what to do when there are conflicting inferences in a case alleging an unlawful conspiracy in violation of antitrust laws, concluding that a defendant's summary judgment motion should be granted unless the plaintiff produces evidence supporting an inference that unlawful conspiracy was *"more likely than"* permissible competition. (*Id.* at p. 857.) *Aguilar* also stated earlier that "[t]here is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.)

*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870 [116 Cal.Rptr.2d 158] noted that this embellishment is inconsistent with the summary judgment statute and with other passages in *Aguilar*. (*Id.* at pp. 881–882.) To create a triable issue, it should be enough to show that two conflicting inferences can be reasonably drawn from the evidence, not that the opposition's evidence preponderates. According to the statute, a court may not grant the motion "based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (§ 437c, subd. (c).) On further consideration, we are inclined to agree with the Second District Court of Appeal, Division Five, that the special rule for conflicting inferences stated in *Aguilar* is limited to summary judgment motions in antitrust cases. (*Kids' Universe v. In2Labs, supra*, 95 Cal.App.4th at pp. 881–882.)

According to Employee's declaration, Employer's CFO essentially told him that he was being terminated for the second reason only and not for the first reason, though the investigator had made findings supporting the first reason.

We do not regard this as evidence that Employer has offered fundamentally different justifications for terminating Employee. (*Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 680 [111 Cal.Rptr.3d 896].) At most, there is some inconsistency as to which of the stated reasons truly motivated Employer's decision. Employee's declaration does tend to undermine the first and third reasons stated by Forcht.

■ The remaining question is whether this factual discrepancy creates a material triable issue. As Employer points out, there must be more than inconsistent justifications for an employee's termination to support an inference that the employer's true motivation was discriminatory. *Guz, supra*, 24 Cal.4th 317 stated: "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. ([*St. Mary's Honor Center v.* ]*Hicks*[ (1993)] 509 U.S. 502, 521 [125 L.Ed.2d 407, 113 S.Ct. 2742].) Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. (*Id.*, at p. 517 . . . .) Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. (*Id.*, at pp. 510–520 . . . .) Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th 360–361, fn. omitted.)[15]

■ Logically, disbelief of an Employer's stated reason for a termination gives rise to a compelling inference that the Employer had a different,

---

[15] Prior to this exposition in *Guz*, in a widely quoted passage, the Fourth District Court of Appeal, Division One, stated: " 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons." [Citations.]' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [67 Cal.Rptr.2d 483], quoting *Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765, fn. omitted.)

unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one. As the United States Supreme Court said in the context of a trial, "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' [Citation.] In other words, '[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.' " (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 146–147 [147 L.Ed.2d 105, 120 S.Ct. 2097], quoting *St. Mary's Honor Center v. Hicks, supra*, 509 U.S. 502.) When an employer's stated reasons are incredible or doubtful, a fact finder must look elsewhere for evidence of the employer's true reasons.

As indicated above, Employee goes on to argue that he has established pretext through evidence showing that "all three reasons now articulated by" Employer are false. He claims to have "presented abundant evidence that he did cooperate at every turn with the investigation and that he never lied to Ms. Mistry." This evidence, presumably, is his own declaration.

Employee would like to make this action depend on whether Employer's stated reasons for terminating him were adequately substantiated, in other words, whether Employer actually had good cause to terminate him. However, that would not be the proper question for the fact finder even if Employer were required to have good cause for Employee's termination.

As indicated above, one issue resolved in *Cotran, supra*, 17 Cal.4th 93 was: "When an employee hired under an *implied* agreement not to be dismissed except for 'good cause' is fired for misconduct and challenges the termination in court, what is the role of the jury in deciding whether misconduct occurred? Does it decide whether the acts that led to the decision to terminate happened? Or is its role to decide whether the employer had reasonable grounds for *believing* they happened and otherwise acted fairly?" (*Id.* at p. 95.) The court concluded that "it was error to instruct that Rollins could prevail only if the jury was satisfied sexual harassment *actually* occurred . . . . On retrial, the jury should be instructed . . . that the question critical to defendants' liability is not whether plaintiff *in fact* sexually harassed other employees, but whether at the time the decision to terminate his employment was made, defendants, acting in good faith and following an investigation that was appropriate under the circumstances, *had reasonable grounds for believing plaintiff had done so.*" (*Id.* at pp. 108–109, italics

added.)[16] In other words, the question for the fact finder in examining a termination for good cause is whether the termination was objectively reasonable, not objectively justified.

■ This is not the standard, however, when an at-will employee is terminated. (*Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal.App.4th 1383, 1390–1391 [77 Cal.Rptr.2d 383].) "Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant." (*Guz, supra,* 24 Cal.4th 317, 351; cf. *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 365 [76 Cal.Rptr.2d 670].) Since an employer does not require good cause to terminate an at-will employee, in the normal course of events an employer need not either articulate or substantiate its reasons, except to provide an advance refutation for any inference that the true reason was illegal. Unless at-will employers are to be held to a good-cause standard for termination, no inference of discrimination can reasonably be drawn from the mere lack of conclusive evidence of misconduct by the employee.

Employee refuses to acknowledge that Employer did not need good cause to terminate his at-will employment. It would be superfluous for us to catalog what has been recognized in the case law as good cause for terminating an employee who is not at-will. We will not be drawn into an extended examination of the sufficiency of the evidence to support each stated reason for Employee's termination and whether Employee has adequately contradicted the investigator's conclusions. At most, the lack of any substantiation of the stated reasons would give rise to an inference that Employer must have had other unstated reasons for the termination, but it would not necessarily give rise to a reasonable inference that Employer's motivation was illegal. Again, we must look elsewhere for evidence creating a triable factual issue as to Employer's true motivation.

### 2. *Evidence of Discrimination*

■ This court explained in *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748 [52 Cal.Rptr.2d 620] (*Heard*): "In general, there are two types of illegal discrimination. These are disparate treatment

---

[16] *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426 [60 Cal.Rptr.3d 359] (*King*) states that an employer satisfies its initial summary judgment burden by producing evidence that the employer "honestly believed" the employee committed misconduct, not whether he actually committed misconduct. (*Id.* at p. 433.) In that case, the appellate court assumed that the employee was subject to termination only for good cause. (*Id.* at p. 438.) In one passage, Employer suggests that the standard is whether it had an honest belief that Mistry's conclusions were correct, but we do not understand Employer to be conceding that Employee could only be terminated for good cause.

and disparate impact. Under the disparate treatment theory, . . . , an individual is discriminated against when the employer 'treats some people less favorably than others because of their race, color, religion, sex or national origin.' (*Teamsters v. United States* (1977) 431 U.S. 324, pp. 335–336, fn. 15 [52 L.Ed.2d 396, 97 S.Ct. 1843].) [¶] In disparate treatment cases, the plaintiff must prove the ultimate fact that the defendant engaged in intentional discrimination. (*St. Mary's Honor Center v. Hicks*[, *supra*,] 509 U.S. 502, 510–511 . . . ; *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 253 [67 L.Ed.2d 207, 101 S.Ct. 1089].)" (Cf. *Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 61 [119 Cal.Rptr.3d 166].)

The United States Supreme Court has elaborated that "[l]iability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.' [Citation.] By contrast, disparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' [Citation.] Under a disparate-impact theory of discrimination, 'a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a "disparate-treatment" case.' [Citation.]" (*Raytheon Co. v. Hernandez* (2003) 540 U.S. 44, 52–53 [157 L.Ed.2d 357, 124 S.Ct. 513].)

"Both FEHA and Title VII cases recognize that evidence of hostile, sexist statements is relevant to show discrimination on the basis of sex." (*Lyle, supra*, 38 Cal.4th 264, 281.) Employee has presented no such evidence of derogatory, pejorative, or demeaning statements reflecting antipathy towards males by those directly involved in the decision to terminate Employee or by anyone who influenced the decision makers. (Cf. *Reid v. Google, Inc., supra*, 50 Cal.4th 512, 535–536 [employee presented several arguably ageist remarks].)

This court has acknowledged that "[p]roving intentional discrimination can be difficult because '[t]here will seldom be "eyewitness" testimony as to the employer's mental processes.' [Citations.] It is rare for a plaintiff to be able to produce direct evidence or 'smoking gun' evidence of discrimination. [Citations.]" (*Heard, supra*, 44 Cal.App.4th 1735, 1748.)

In this case, the groundless nature of Employee's claim of antimale discrimination is revealed by comparing his contentions with the evidence in this record. As indicated above, Employee tells a story that is not supported by the facts.

Employee contends that discrimination can be inferred from the following evidence. The "investigation . . . was deeply flawed and biased against men." Employee "was terminated despite being cleared of the charges levied against him by Ms. Thomas." "[H]is female accuser, after filing false charges to protect her precarious employment situation, was not reprimanded in any way [and] was characterized as 'credible' by the investigator though she made accusations that were false. Meanwhile, the only two substantive male witnesses[] were terminated and reprimanded, respectively."

These contentions have virtually no evidentiary support. Footnotes 4 and 5, *ante*, and the related text have already established that Employee was not cleared of all charges made by Thomas. Mistry found that Employee regularly made sexist and racist jokes as Thomas had claimed. Thus, Thomas's charges were found partly credible and Employee was found to have violated Employer's ethics and sexual harassment policies.

We confess to not understanding Employee's characterization of himself and Curt Oliver as "the only two substantive male witnesses." Mistry also interviewed a male contracts administrator named Dennis Backens. Employee does not explain why Backens was not a "substantive" male witness.

Employee's implication that Mistry's report led to adverse employment actions for male witnesses only and for the only male witnesses is unjustified. There is no indication that Backens was subject to any adverse action. While it may be technically accurate that Thomas was not "reprimanded" by Employer, neither did Mistry conclude that Thomas intentionally misrepresented any facts, unlike Employee and Oliver. Mistry did conclude that Thomas had a distorted notion of her work performance, and Thomas remained subject to the PIP as a result. Employer thus meted out discipline to male and female employees in accordance with Mistry's conclusions.

*Duchon v. Cajon Co.* (6th Cir. 1986) 791 F.2d 43, on which Employee relies, is entirely distinguishable. In that case, the employer imposed "disparate discipline" on male and female employees who engaged in the same conduct, having a personal affair. (*Id.* at p. 46.)

 To establish discrimination based on disparate discipline, it must appear "that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly." (*Lathem v. Department of Children and Youth Services* (11th Cir. 1999) 172 F.3d 786, 792.) What appears here is that Employee was a manager while Thomas and Oliver were his subordinates. Further, Mistry concluded that they engaged in

some different conduct. While Oliver and Employee both told inappropriate jokes, Mistry recommended only that Oliver be given a written warning for making intentional misrepresentations in the investigation. "Different types and degrees of misconduct may warrant different types and degrees of discipline . . . ." (*Burke-Fowler v. Orange County, Fla.* (11th Cir. 2006) 447 F.3d 1319, 1325; cf. *Conward v. Cambridge School Committee* (1st Cir. 1999) 171 F.3d 12, 21.) No inference of discrimination reasonably arises when an employer has treated differently different kinds of misconduct by employees holding different positions.

Employee has presented no expert testimony that any inference of disparate treatment based on antimale motivation could be extracted statistically from such a small sample size of three employees. *Guz* found that "a group of six is simply too small to be statistically significant" in demonstrating age discrimination. (*Guz, supra*, 24 Cal.4th 317, 375–376, and cases there cited.)

Setting aside statistical inferences, we accept Employee's implicit legal premise that Employer could be liable for Mistry's discriminatory motivation if the male executives who actually terminated Employee were merely the cat's paws of a biased female investigator. (*Staub v. Proctor Hospital* (2011) 562 U.S. ___, ___ [179 L.Ed.2d 144, 131 S.Ct. 1186, 1194]; *Reeves v. Safeway Stores, Inc., supra*, 121 Cal.App.4th 95, 116; see *Young v. Dillon Companies, Inc.* (10th Cir. 2006) 468 F.3d 1243, 1253.)

This premise, however, also lacks factual support. As indicated above, Mistry's conclusions and Employer's adverse employment actions provide no statistical support for inferring that Mistry had an antimale bias. There is no evidence that Mistry made any antimale statements. There is no evidence that Employee's supervisors were required to adopt Mistry's conclusions and recommendations if the conclusions were completely inconsistent with what the supervisors knew of Employee's character and conduct.

As to the investigation being flawed and biased, Employee complains that he was not informed of the charges against him by Employer or Mistry. But he cites no provision of his employment contract or employment law in general entitling an at-will employee to advance notice and a hearing before termination. His employment contract provided that he could be terminated without notice.

Employee contends that "[b]oth his observations and those of Curt Oliver are clear evidence of discrimination." Oliver disputed Mistry's conclusion that he had intentionally misrepresented facts to her. He claimed that he

honestly failed to recall Employee mentioning Playboy magazine. Despite Oliver's honesty, she accused him of lying and defending Employee. Oliver considered her investigation "to be geared towards a conclusion that she had already formulated, rather than being an unbiased, professional fact-finding effort." Employee likewise disputed Mistry's conclusions that he was uncooperative and had intentionally misrepresented facts to her. He claimed that he honestly failed to recall the agenda item regarding e-mail. He found her rude and condescending and believed that she had prejudged his character.

Even accepting the perspectives of Employee and Oliver, what is lacking is any evidence supporting a reasonable inference that Mistry's interview behavior with each of them or her conclusions about them were based on their being male, as opposed to them appearing to be evasive. We hope that Employee is not suggesting that it is part of being male to be evasive, deceptive, racist, or sexist. The following statement is apt, with slight modifications. "For [Mistry's] alleged discriminatory motive and conduct to be a triable issue, [Employee] would have to 'substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy.' " (*Amini v. City of Minneapolis* (8th Cir. 2011) 643 F.3d 1068, 1075.)

We conclude that the showing made in Employer's summary judgment motion shifted the burden to Employee to establish the existence of a material, triable issue, in this context, evidence supporting a reasonable inference that Employer's termination of Employee was based even partly on discrimination against males. We further conclude that Employee has failed to shoulder this burden. There is no evidence of express antipathy to males, no evidence of disparate discipline, indeed nothing more than rank speculation that Mistry was biased against males. No reasonable inference of a discriminatory motive can be drawn from this evidence.

## VI. Defamation

Employee alleged that he was slandered when at least one of his former coworkers asked why he was terminated and Employer's HR vice-president Forcht answered that he was uncooperative in the investigation, despite receiving several warnings. Employee's declaration asserted that Forcht told Irene Chen, a coworker, that Employee was warned before his termination, that a manager should not need a warning, and that Employee was terminated for being uncooperative. According to Employee's declaration, Forcht directed him to cooperate in the investigation, but he was never warned about any of his conduct as an employee.

## A. *The Statutory Common Interest Privilege*

Civil Code section 47 provides in pertinent part that a publication or broadcast is privileged if made: "(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." The legislative history of this statute indicates that "the Legislature intended to codify the narrow common law privilege of common interest, not to create any broad news-media privilege." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 727 [257 Cal.Rptr. 708, 771 P.2d 406] (*Brown*).)[17]

 This common interest privilege is not well defined, but it has been determined to apply to statements by management and coworkers to other coworkers explaining why an employer disciplined an employee. (*Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846 [115 Cal.Rptr. 582] (*Deaile*) [forced retirement after employee falsified time cards]; *King, supra,* 152 Cal.App.4th 426, 440.) "Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past." (*Deaile, supra,* 40 Cal.App.3d at p. 849.)

 *Brown* stated that, for purposes of this subdivision, "malice has been defined as 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " (*Brown, supra,* 48 Cal.3d 711, 723.) In other cases, the California Supreme Court has explained: " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights (citations)." ' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721 [54 Cal.Rptr.3d 775, 151 P.3d 1185], quoting *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134

---

[17] Civil Code section 47, subdivision (c) goes on to provide specifically that this privilege applies to communications by former employers to prospective employers. (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1369 [7 Cal.Rptr.3d 216] (*Noel*).) We are not concerned with this aspect of the privilege.

Cal.Rptr. 402, 556 P.2d 764], which in turn quoted *Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 936 [119 Cal.Rptr. 82].)[18]

---

[18] The judicial evolution of this definition deserves some attention, though it is not raised as an issue in this appeal, as it reflects the unacknowledged marriage of two different concepts of malice, one arising from statute, the other from the First Amendment.

"Malice" in Civil Code section 47, subdivision (c) was long interpreted as involving, if not actual ill will, at least "the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter." (*Emde v. San Joaquin County Central Labor Council* (1943) 23 Cal.2d 146, 154–155 [143 P.2d 20] (*Emde*).)

The notion that "malice" involves a separate component of acting (presumably communicating) in reckless disregard of the plaintiff's rights is a more recent development. This language appears to have originated in the 1975 decision by the First District Court of Appeal, Division Two, in *Roemer v. Retail Credit Co., supra*, 44 Cal.App.3d 926, 936 (*Roemer*). *Roemer* relied on two cases, but neither one of them supports the proposition stated in *Roemer*. The phrase "reckless disregard" appears nowhere in the earlier of those cases, *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536 [343 P.2d 36], which simply restated the law as stated in *Emde*. (*Id.* at p. 552.)

The other case cited by *Roemer, Field Research Corp. v. Patrick* (1973) 30 Cal.App.3d 603 [106 Cal.Rptr. 473] (*Patrick*), did speak of a form of "reckless disregard" in the following passage on page 606: "The principal issue was the question whether Patrick's otherwise privileged comment was made with '*actual malice.*' Here the parties were in agreement that the applicable rule provided that a public figure was precluded from recovering damages for a defamatory remark about his public conduct, in the absence of proof that the statement was made with actual malice—that is, *with knowledge that it was false or with reckless disregard of whether it was false or not.* (See *Rosenbloom v. Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811]; *Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265 [28 L.Ed.2d 35, 91 S.Ct. 621]; *Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; *Beckley Newspapers v. Hanks* (1967) 389 U.S. 81 [19 L.Ed.2d 248, 88 S.Ct. 197]; *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710].)" *Patrick* did not speak of the reckless disregard of a plaintiff's rights, but a reckless disregard of the truth of a statement. Reading this passage and the remainder of the decision reveals that the privilege at stake in *Patrick* was a constitutional privilege of free speech, not the common interest statutory privilege. This miscitation of *Patrick* by *Roemer* is particularly surprising, as the opinion earlier distinguished *Patrick* as involving First Amendment protection for statements about public figures or on topics of public concern. (*Roemer, supra,* 44 Cal.App.3d 926, 935.)

Prior to *Roemer,* we find no authority describing statutory malice as involving either a reckless disregard for the truth of the statement or a reckless disregard of the plaintiff's rights, with one exception. In an earlier opinion in *Roemer v. Retail Credit Co.* (1970) 3 Cal.App.3d 368 [83 Cal.Rptr. 540], Division Three of the First Appellate District said the following of the common interest privilege: "We are satisfied that mere negligence in investigation of the facts, in the sense of oversight or unintentional error, is not alone enough to constitute malice. It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown." (*Id.* at p. 372.) In support of this conclusion, the opinion cited the First Amendment definition of malice established in *New York Times Co. v. Sullivan, supra,* 376 U.S. 254 without acknowledging that the case before it presented no First Amendment issues.

*Brown, supra,* 48 Cal.3d 711 subsequently concluded that a private person need not prove First Amendment malice in order to recover for defamation by statements that are not of public concern. (48 Cal.3d at pp. 742, 747.) In reaching this conclusion, the California Supreme Court thoroughly examined both the history of the statutory common interest privilege against

## B. *Applying the Law*

Forcht has declared that he harbors no hatred, ill-will, or malice towards Employee. Employee does not assert the existence of this kind of actual malice. He contends that he has produced evidence that Employer "had no reasonable grounds for believing that [Employee] did not cooperate during the investigation, and on the issue of being forewarned, [Employer] presents no evidence of any such warning."

Employee's argument seeks to resurrect the question whether his termination was factually justified. That was not the relevant question in the wrongful termination above, and it is still not the relevant question in the context of defamation. For purposes of establishing a triable issue of malice, "the issue is not the truth or falsity of the statements but whether they were made recklessly without reasonable belief in their truth." (*Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 999 [225 Cal.Rptr. 852].) A triable issue of malice would exist if Forcht made a statement in reckless disregard of Employee's rights that Forcht either did not believe to be true (i.e., he actually knew better) or unreasonably believed to be true (i.e., he should have known better). In either case, a fact finder would have to ascertain what Forcht subjectively knew and believed about the topic at the time he spoke.

In this case, it is an undisputed fact that Mistry reported to Employer that Employee did not cooperate with her investigation. It is also undisputed that, when Employee was terminated, Employer's CFO told him that it was due in part to his lack of cooperation in the investigation. Although it is disputed by Employer, we will assume for purposes of discussion that Forcht confirmed to

---

defamation (*id.* at pp. 723–738) and the more recent application of the First Amendment to the law of defamation when statements about public officials or on matters of public concern were involved (48 Cal.3d at pp. 721–723). *Brown* kept separate the constitutional definition of "actual malice" and the common law definition of "malice" as used in Civil Code section 47, subdivision (c).

However, a number of opinions have followed in the footsteps of the First Appellate District in applying the First Amendment definition of "actual malice" to determine whether the statutory common interest privilege exists. (E.g., *Taus v. Loftus, supra,* 40 Cal.4th 683, 722; *Noel, supra,* 113 Cal.App.4th 1363, 1371 [Fourth App. Dist., Div. One]; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931 [120 Cal.Rptr.2d 576] [Fifth App. Dist.]; *Warfield v. McGraw-Hill, Inc.* (1973) 32 Cal.App.3d 1041, 1047 [108 Cal.Rptr. 652] [Second App. Dist., Div. One].)

We are reluctant to implicitly constitutionalize the statutory privilege for statements of common interest. We note that there is an arguable distinction between making a statement with a reckless disregard for its truth and simply lacking reasonable grounds for believing it true. While every instance of a reckless disregard for veracity will also involve a lack of reasonable grounds for believing a statement true, the converse is not necessarily true. It may not be reckless to make a statement without a reasonable foundation. We will keep this difference in mind in discussing the statutory privilege.

a coworker that Employee was terminated for not cooperating with the investigation. Forcht has subsequently declared that this was one of the reasons for Employee's termination.

Employee claims that he was in fact cooperative, but that is beside the point. We see no evidence that Forcht actually believed that Employee was cooperative when Forcht said otherwise. Nor has Employee produced evidence that no reasonable person could have believed what Mistry reported about Employee's lack of cooperation. She cited several examples of his refusals to answer and misleading statements. Employee has admitted that he misstated a fact and did not answer one of her questions, though he has offered excuses for doing so. There is no evidence that Forcht was aware of Employee's version of their interview when Forcht spoke with Chen. Even if Forcht had been aware of Employee's version, Employee presents no evidence or reason compelling Forcht to have accepted Employee's version and discounted Mistry's version. Mistry's report therefore provided a reasonable ground for the statement that Employee was uncooperative. Assuming that Forcht told Chen that Employee was fired for not cooperating with the investigation (a fact not supported by Chen's declaration), Employee has presented no evidence giving rise to a reasonable inference either that Forcht did not believe it when he said it or that Forcht's belief was unreasonable. This statement was conditionally privileged.

Unlike Mistry's description of Employee's uncooperativeness, her report contains no statement about Employee being warned prior to his termination. If we assume for the sake of discussion that Forcht told Chen that Employee was warned, as Employer points out, Forcht had other grounds for saying so. Employee's declaration admitted that Forcht directed him to cooperate with the investigation. Obviously, Employee did not and still does not regard this advice as a warning, any more than he regarded as warnings Employer's written policies on sexual harassment and business and personal ethics. Again, the issue is not whether Employee actually received a warning, but whether Forcht either knew or should have known better when he said so. Employee's continued disregard of his Employer's admonitions does not make it unreasonable for Forcht to have regarded them as warnings. We see no material, triable issue as to whether this statement was conditionally privileged. It was.

In light of these conclusions, we need not reach Employer's contentions that the trial court erred in not ruling on its hearsay objection to Employee's quotation of Chen and that the statements about Employee were merely opinions, not facts.

## VII. DISPOSITION

The judgment is affirmed.

Elia, J., and Duffy, J.,[*] concurred.

---

[*]Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.