Filed 7/11/16  Sepulveda v. United Parcel Service CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| EDWARD SEPULVEDA, | H038738 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-09-CV-139823) |
| v. | |
| UNITED PARCEL SERVICE, INC., | |
| Defendant and Respondent. | |

## I. INTRODUCTION

This case arises from difficulties plaintiff Edward Sepulveda (Employee) had with fellow car washer Byron Smith and how their employer, defendant United Parcel Service, Inc. (Employer), responded to Employee's complaints about Smith.  Employee and Smith worked together for two periods of time.  Smith was already working as a car washer in Employer's Sunnyvale facility when Employee was hired in April 1989.  They both worked the night shift until May 2001, when Employee got a job on the day shift to get away from Smith.  According to Employee's complaint, Smith, an African-American, heckled and insulted Employee, calling him " 'Ed-iot' " and harassing him about his race, calling him a " 'stupid' " or " 'dumb Puerto Rican.' "

This action is predicated on what occurred after Employee and Smith began working together again in October 2006, when Smith got a position on the day shift to accommodate a medical condition.  According to Employee's complaint, Smith's hostilities resumed.  According to their supervisors, each one frequently complained to

the supervisors about the other not pulling his own weight on the job, among other things. They did not work together continuously during this second period of time. After about two weeks in October 2006, their duties were separated after Smith complained of a workplace injury. They began working together again in late November 2006, but Employee went out on medical leave and vacation from December 9, 2006, through July 9, 2007. Before Employee returned to work, he arranged with Employer to divide the duties of the three day shift car washers to keep Smith away from him. When Smith complained about not having enough work, their supervisor, Sam Sisneroz, reviewed the day shift work and eliminated the third car washer position because there was not enough work. As the car washer with the least seniority, Employee was bumped off the day shift and reassigned to the night shift effective August 13, 2007.

Employee worked a day or two on the night shift before taking sick leave from August 16 through September 10, 2007. The night he returned to work, he got into a verbal confrontation with Sisneroz that began with a reprimand for Employee running a stop sign on Employer's premises. Employee termed Sisneroz an "asshole" during this confrontation and disobeyed Sisneroz's repeated instructions not to walk away from him. After corroborating what Employee said, Sisneroz terminated him on the spot for "gross insubordination," as authorized by the applicable collective bargaining agreement.

Employee, representing himself, has alleged that Employer's true motivation for eliminating the third car washer position and terminating him was retaliation for charges he filed with the federal Equal Employment Opportunity Commission (EEOC) in July or August 2007 asserting that Employer was discriminating against him based on his race and national origin of Puerto Rico. Employee alleged Employer discriminated against him by favoring an African-American car washer over him. Employee also alleged that he endured harassment by Smith and a hostile workplace because Employer failed to curb Smith's conduct for fear Smith would play "'the race card.'"

2

The trial court granted Employer's motion for summary judgment (Code Civ. Proc., § 437c)[1], concluding that there are no triable issues and that Employer has shown without contradiction: there was no harassment to prevent; any harassment by Smith was not "repeated, severe and pervasive" and did not create a hostile work environment; Employer took prompt and reasonable action on Employee's complaints about Smith; Employee's transfer from the day shift to the night shift is not actionable because it "did not result in any diminution in pay or benefits;" Employer had "legitimate, non-retaliatory reasons" for transferring Employee to the night shift and terminating his employment; and the terminating supervisor was unaware of the EEOC charges Employee had filed. After independently reviewing the available evidence, we will affirm the judgment. We will also reject Employee's challenge to the award of costs.

## II. TRIAL COURT PROCEEDINGS

### A. COMPLAINT AND DEMURRERS

A second amended complaint dated August 13, 2010, alleged the following facts. Employee is a Puerto Rican male who washed delivery trucks for Employer from April 1989 until his termination on September 11, 2007. There are two shifts for car washers. Employee worked the day shift from May 2001 through August 2007. In June 2006, he fell on the job and tore a meniscus. Due to this injury, he preferred working the day shift because it was warmer outside where he worked.

In December 2006, defendant Byron Smith, an African-American car washer, "was given Plaintiff's shift in violation of the Union Contract." Smith constantly harassed Employee about his race, making comments "such as 'You are a stupid Puerto Rican,' or 'You are a dumb Puerto Rican.'" Employee complained to his supervisor, defendant Frank Leong, on a daily basis about the harassment. The only response by

---

[1] Unspecified section references are to the Code of Civil Procedure.

3

management was to reassign Employee to the night shift in August 2007. When Smith was given Employee's day shift, Leong told Employee that he did not want Smith to "'use the race card.'" "The managing agents of Defendant [Employer] Frank Leong and Sam Sisneroz gave Defendant SMITH preferential treatment over Plaintiff due to Defendant SMITH's race. These managing agents also informed Plaintiff that it was their practice to do so because of Defendant SMITH's race."

Working outside in the cold aggravated Employee's knee injury, so his doctor put him on medical leave from December 8, 2006 through May 30, 2007, while he recovered from knee surgery. Employee used vacation time to take June 2007 off when his second child was born. Before returning to work, he met with his manager and his union representative about his complaints about Smith and it was agreed the two car washers would stay away from each other in the work yard.

Employee returned to work the first week of July 2007. Smith resumed harassing Employee, calling him "Ed-iot" across the yard and making race-based insults. Employee complained to Leong without any response, so Employee filed a charge with the EEOC on August 16, 2007, and told his supervisors he had done so.

Days after Employee filed his charge, his supervisor, defendant Sam Sisneroz, conducted a time study on Employee's work that resulted in Employee being assigned to the night shift beginning September 9, 2007.

On September 10, 2007, Sisneroz yelled at Employee as he was driving a truck through the yard, calling him by his first name. Employee asked to be called "Mr. Sepulveda" and called Sisneroz an "asshole" as Employee walked away from him. Another manager, defendant Jon Fischer, said he heard what Employee had said. Sisneroz ordered Employee to come to his office. Employee left to find a shop steward or union representative and returned when he could not find one. Sisneroz terminated him on the spot on September 11, 2007. Sisneroz escorted Employee to the company locker room so he could gather his things and leave.

4

The second amended complaint purported to state six causes of action arising from these facts.  Employee was subjected to workplace harassment (second cause of action) and a hostile work environment, including "insult, unwarranted disciplinary actions, work schedule reassignment, and ultimately termination from his employment based on his race and national origin" (third cause of action).  Employer failed to prevent this discrimination (fifth cause of action) and in fact aided and abetted it (sixth cause of action).  Employer and its managers retaliated against Employee for filing discrimination claims by transferring him to the night shift, ostracizing him, and terminating him (first cause of action).  This amounted to a tortious discharge in violation of public policy (fourth cause of action).

On March 3, 2011, the trial court dismissed the sixth cause of action for aiding and abetting discrimination.[2]  On February 27, 2012, the trial court sustained demurrers without leave to amend by individual defendants Sisneroz, Fischer, and Smith on multiple grounds including the statute of limitations.

## B.  MATERIAL FACTS ESTABLISHED BY SUMMARY JUDGMENT MOTION

Employer filed a motion for summary judgment or adjudication dated March 2, 2012, supported by declarations, depositions, and a request for judicial notice.  The hearing was originally scheduled for June 7, 2012.  On May 30, 2012, in response to Employee's ex parte application, the court continued the hearing to June 28, 2012, giving Employee until June 14 to file an opposition and Employer until June 22 for a reply.  On June 14 Employee filed an opposition stating in part, "Realistically speaking, [Employee] cannot defeat [Employer's] motion for summary judgment" because the court did not

---

[2] Employer's brief asserts that the court sustained a demurrer on January 11, 2011, to Employee's sixth cause of action for aiding and abetting discrimination.  No such order appears in the appendices, but the judgment filed July 17, 2012 recites that the sixth cause of action was dismissed on March 3, 2011.

give Employee, who was representing himself, enough time to respond. Employee's opposition was based on his own declaration and others, a separate statement of facts, and 27 documents attached as exhibits. Neither side's original separate statement appears in the appendices on appeal, but there is a comprehensive "reply separate statement" by Employer summarizing its original statement of 109 undisputed material facts, Employee's responses to them, and Employer's replies. (Capitalization omitted.) The same document also provided Employer's responses to Employee's declaration. Employer also filed objections to the documents attached to the opposition and the declarations by Tony Soto, Chuck Andrew, Russ Ford, and Jim Clements, as Employee had not previously disclosed them as witnesses during discovery in violation of a court order. The trial court did not expressly rule on these objections in granting summary judgment.

Our recital of facts is taken from Employee's deposition of April 19, 2011, except as otherwise indicated.

### 1. Employee's working relationship with Byron Smith

According to Byron's Smith's declaration, Employer hired him in July 1980 as a car washer to clean and fuel the tractors attached to the feeder trailers. He worked the night shift at the Sunnyvale facility until he returned from a medical leave of absence on October 2, 2006, when he was put on the day shift to accommodate his medical limitations.

According to Employee's deposition, Employer hired Employee as a part-time car washer in April 1989. After working mostly in the Sunnyvale facility for about four years, Employee became a full-time car washer. He worked the night shift with Smith until he transferred to the day shift in May 2001. When they both worked the night shift, Smith harassed Employee by saying he was a "'stupid Puerto Rican'" and had described Puerto Ricans as the offspring of blacks and Mexicans. Employee complained to a supervisor of the car washers who said he would talk to Smith about it. Employee

6

declared that he sought the day shift job in 2001 in order to get away from Smith after Smith had tried to get him fired.

Also according to Employee's deposition, he and Smith worked together on the day shift for the first half of October 2006. Smith was loud and obnoxious. "The very first day" Employee "walked in to the locker room," Smith called Employee "Precious[.]" Employee "quickly shut him down," telling Smith he was not going to engage in "a war of words." Smith's comments "pretty much subsided after that." Employee avoided Smith as much as he could. Smith was supposed to direct his job complaints to Employee as shop steward and he did so. When Smith complained about the work and proposed switching jobs, Employee told Smith he had the job he had asked for.

Smith renewed his request for another position when he had another injury shortly after he came back in October 2006. Employer asked Employee and the other day car washer, Tony Soto, to accommodate Smith, and "[a]fter much debate with the union and the company," they agreed to rearrange their duties so that Smith would do Soto's job, which was "the tractor line-up." Employee agreed to the change in mid-October 2006 partly so he would not be working with Smith. Smith cleaned tractor cabs and Employee cleaned out the trailers.

In November 2006 Smith began complaining about his new position, saying he was being mistreated because he is black. "Everything – anything that transpired around there, he wasn't accommodated because he was black." At the end of November 2006 Smith got medical clearance to resume his earlier day position. Employee spoke with Frank Leong, Employer's business manager, about it. Employer favored Smith resuming his position, so Employee and Soto agreed to return to their original duties on the day shift. Smith and Employee worked side-by-side cleaning trash and pallets out of large feeder trailers until Employee went out on medical leave on December 9, 2006, due to a knee injury.

7

Once Smith was reinstated in his old position, he said he was "'the boss around here'" and the "'new sheriff in town.'" He said they could not do anything because he is a black man. Smith called Employee "'Ediot.'" Smith knew how to push Employee's buttons. Before Employee left work on medical leave, "I don't believe, at that time, if I can – if I recall correctly, that he actually said any specific racial to me, but that's when I went to Frank and complained about him just constantly badgering me with this – with his rhetoric." He told Leong it was a "hostile work environment" and he did not want to hear from Smith or talk to him. Leong said it was a hostile environment if there was name-calling. Employee complained to his union about the position switch. He could not recall whether that phone call ever turned into a formal written grievance.

Employee was out on medical leave until the end of May 2007, and then he took vacation that lasted until July 9, 2007. While out on leave, he made a successful bid to return to the day shift, knowing Smith was on that shift. Before returning to work, in June 2007 Employee and union representative Chuck Andrew spoke with Leong about Employee's difficulty in working with Smith. Employee said it was a "hostile work environment" because Smith seemed to enjoy bothering him. He did not want to continue hearing Smith say the company could not do anything to him because Smith was black. Employee told Leong they were discriminating against him because he is not black.[3] Leong agreed to Employee's proposal for a division of labor that would separate Employee and Smith "geographically in the yard."

---

[3] Employee's brief purports to quote Chuck Andrew declaring that "At this meeting Leong stated several times that he was reluctant to do anything to Smith for fear he would use the race card." No such language appears in the cited declaration. Moreover, in the trial court Employer objected to reliance on the Andrew declaration, among others, because the declarants had not been named as witnesses in violation of a discovery order. Employer also objected to the hearsay basis of this declaration. The trial court did not rule on these objections.

8

Leong has declared that Smith and Employee had a contentious relationship and frequently accused each other of being lazy, hiding equipment, and not performing their jobs correctly. Each was a high maintenance employee with a bad attitude who worked as little as possible. Leong agreed with Employee to restructure the duties of the day car washers to keep them apart when Employee returned to work.

When Employee first returned to work on July 9, 2007, he and Smith kept their distance. After a week or two, Smith began doing Employee's work and using his equipment. Employee complained to Leong, who told him to keep his mouth shut and do his job. Leong apparently reprimanded Smith about coming into Employee's work area.

Leong declared that the new division of labor did not resolve the issues between Smith and Employee. Smith complained about not having enough work. Employee complained about Smith entering his work area. Leong asked Employee to stop complaining and focus on his job and told Smith to keep out of Employee's work area except for getting supplies.

Smith declared that he complained to Leong and feeder manager Sam Sisneroz that the new division of labor left him without enough work. He did enter Employee's work area one day to retrieve supplies and, after Employee complained, Leong told him to stay in his own area.

Leong arranged a meeting on July 19, 2007, involving Employee, Smith, Leonard, Shop Steward, Valdez, and Temmet Oliver, Jr., a feeder supervisor trainer, to address Employee's complaints about Smith coming into his work area. The morning of July 19, Smith entered Employee's work area after Leong's reprimand and gave Employee "dirty looks, menacing looks, and then just started to walk down and start writing trailer numbers and taking notes about the work that was done." Employee went to Leong and asked if he had any control over Smith. Leong said he had spoken to him and they were having a meeting that afternoon. Employee told Leong that he was not going to "another worthless meeting," that he was going to file a complaint with the EEOC about a hostile

9

work environment and racial discrimination. Employee took sick leave and did not attend the meeting with Oliver on July 19. Employee recalled going to the EEOC that day and filing a handwritten charge, though he was unable to find a copy of it before his deposition.[4]

On July 23, 2007, Oliver spoke with Employee and got his version of the events. Oliver said that he and Leong had again instructed Smith to stay away from Employee and his work area. Employee recalled telling Oliver he had filed an EEOC charge. In a written summary of the events dated July 24, 2007, Oliver recalled Employee telling him on July 23, 2007, "now I'm going to the EEOC, and my Law[y]er," and Smith telling him the same day that he was filing an EEOC charge. Oliver suspected that Smith had overheard his conversation with Employee.[5] According to Employee, Tony Soto, who attended the meeting on July 19, confirmed that Smith was told to do his job and not talk to the other car washers.

---

[4] Apparently Employee located the documents after his deposition in April 2011. A completed intake pre-screen form and questionnaire by the EEOC dated July 19, 2007 are Exhibit I in his appendix. The questionnaire states in part: "If you do not wish this questionnaire to be considered a charge, please check the following box." The box indicating the questionnaire is for "informational purposes only" is checked. Employee complained that Employer had double standards, one for African-American employees and another for everyone else.

[5] In the trial court, Employer objected to Employee's reliance on 27 unauthenticated documents attached as exhibits to his opposition. As of the time of Employer's written objections, filed June 22, 2012, Employer had only received 14 of the 27 documents, so its ability to object was limited. As the trial court did not expressly rule on Employer's evidentiary objections, they have been preserved for appeal, and Employer has renewed them. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 533.) Employer now objects to the Oliver letter or memo in part as unauthenticated, hearsay, irrelevant, and lacking foundation. We will overlook the technical objections and accept the letter as authentic. Even accepting the Oliver document as authentic, it does not help Employee (as we discuss herein).

Employee believed he told Jon Fischer about filing an EEOC charge the day after he spoke with Oliver.  Fischer, a computer dispatch supervisor who supervised the night car washers, has declared that he did not hear from Employee or anyone else that Employee had filed an EEOC complaint until after Employee was terminated.

Sisneroz has declared that Employee and Smith had a contentious relationship and got into several yelling matches.  Each accused the other of being lazy, hiding equipment, and not performing their jobs correctly.  He did not hear either one make comments related to race or national origin.  Employee did not complain to Sisneroz about harassment based on race or national origin.

Smith declared that he had a contentious relationship with Employee.  They got into yelling matches.  He denied making comments about Employee's race or national origin.

### 2.  Employee's shift change and termination

At the end of July 2007, a supervisor did a time study of Employee, which led to the elimination of the third day car washer position.  Smith and Soto each had more seniority than Employee, so Employee was the one who was reassigned.

Sisneroz declared that he looked into the day shift car washer duties after Smith complained there was not enough work.  He heard from Employer's efficiency experts that two car washers were enough for the day shift, so he and Jim Peterson, the transportation division manager, decided to eliminate the third position effective August 13, 2007.  There have been two day shift car wash positions ever since.  Patrick Taylor is an industrial planning engineer for Employer who recommended to Sisneroz based on a January 2007 study that two day car washers were more than enough to complete the 11.14 hours of work required from the day car wash shift.  His report was attached to his declaration.  Peterson declared that when he and Sisneroz jointly decided to eliminate the third day car wash position, he was unaware that Employee had filed discrimination, harassment, or retaliation charges with any state or federal agency.  Employee has

11

declared that "Peterson was never notified by anyone of any complaint ever." "Peterson was not involved in day to day operations of the Day Car Wash."

On August 9, 2007, the night car wash lead, Craig Kirkland, told Employee that his day shift position was being eliminated, so he was assigned to the night shift as of August 13, 2007.

Just before beginning the night shift on August 13, 2007, Employee called Employer's compliance hotline to complain about the preferential treatment Smith had received from Employer. According to a contemporary report of Employee's call, Employee said: Smith complained constantly, had a bad attitude, and worked harder at getting out of work than working; when Smith complained that certain work assignments showed discrimination against him, management would back down and give the work to other washers; management once let Smith return to his old job after he did not like the new job he had asked for; Employee had complained to management with no results. Employee did not mention Smith harassing him based on race or national origin.

Employee took sick leave from August 16 to September 10, 2007. On August 16, 2007, Employee filed a revised discrimination charge with the EEOC. He alleged discrimination based on race and national origin and also retaliation. The revised charged, which was in evidence, alleged that between October 2006 and December 8, 2006, Employee "was frequently subjected to racial comments and derogatory comments about my national origin, Puerto Rican, by my co-worker, Byron Smith, African American." "I have complained to Frank Leong, Asian, Vietnamese, on many occasions[] about the harassment but to no avail."[6] After returning to work from medical

---

[6] Employee declared that his court complaint "only listed racially charged slurs that Byron Smith had directed at me, which were made after October, 2006" because he had not notified Employer of Smith's harassment before. In fact, "Smith made numerous racial slurs to me above and beyond 'Stupid Puerto Rican' and 'Dumb Puerto Rican.'" "I

*(Continued)*

leave on July 9, 2007, he complained to Leong on July 19, 2007, about continued harassment by Smith with no action taken. His day job was eliminated and he was transferred to the night shift.[7]

While Employee was out on sick leave, he was contacted by Curtis White, Employer's Human Resources Operation Manager, regarding his hotline complaint. Employee told White he had filed an EEOC charge.[8]

Employee returned to work the night shift on September 10, 2007 and was terminated before his shift ended on September 11.

On September 12, 2007, Sam Sisneroz sent an email to Jim Peterson recording his version of the events leading to Employee's termination. Sisneroz's contemporaneous recollection follows except as indicated.

---

specifically recall Byron Smith making comments to me about my Race in November and December, 2006." "In December of 2006, I complained about Smith's harassment on the basis of race to the management at UPS." "Byron Smith heckled [m]e, called me names, invaded my personal space, and directly racially charged slurs at me despite the fact that he was ordered several times to stay away from me and not talk with me." (Emphasis omitted.)

Leong declared that he never heard Smith or Employee make comments related to race or national origin. Employee did not complain to Leong about Smith harassing him based on race or national origin. Leong was not informed that Employee had filed an EEOC charge until after Employee was terminated.

[7] A written notice of Employee's discrimination charge dated August 21, 2007, was sent by the EEOC to a human resources manager for Employer in San Francisco. It required a response by September 21, 2007.

On August 20, 2007, on behalf of Employee's union, Chuck Andrew sent a letter to a labor manager for Employer in San Francisco providing notice of filing a grievance alleging that UPS management had discriminated against Employee. The outcome of this grievance does not appear in the record and was not discussed in Andrew's declaration.

[8] White has declared that he investigated Employee's complaints and found them unsubstantiated. Employee did not tell him about filing an EEOC charge and White did not discuss this topic with Sisneroz or Peterson.

13

Just after midnight on September 11, Sisneroz saw Employee drive at excessive speed in the yard right through a stop sign at a pedestrian crosswalk.  Sisneroz called out to Employee, who was then walking away from him.  Employee turned and approached him with raised arm and pointed finger, insisting that Sisneroz show him respect by calling him " 'Mr. Sepulveda.' "  Sisneroz called him Ed, told him to calm down, and instructed him to obey the speed limit and stop signs.   Employee walked away, yelling " 'Have a nice night Sam.' "  Sisneroz wished Employee to have a nice night.  Employee said, " 'I will[,] asshole.' "  (Emphasis omitted.)[9]  Supervisor Jon Fischer confirmed that he heard what Employee said, so they walked after him and told him to come to Sisneroz's office.

As they walked to Sisneroz's office, Fischer learned that Employee was the shop steward.  Sisneroz had car washer Rich McCann get lead car washer Kirkland.  Employee declined to enter the office, saying it was too small.  Sisneroz made a phone call to Peterson, his supervisor.  McCann and Kirkland left before Sisneroz returned.  Employee started to walk away.  Sisneroz instructed him to stay where he was, saying he would get the other car washers.  Employee continued walking away, though Sisneroz told him three times to stay.  According to Employee's deposition, he told Sisneroz he was going to get a shop steward and walked away, while Sisneroz told him three times to stand where he was.

---

[9] According to Employee's deposition, he did run the stop sign.  Sisneroz called his first name in an agitated manner, got his attention, walked up to him, and told him to obey the stop signs.  "[T]he whole thing blew up" when Sisneroz continued to call him " 'Ed' " after he asked to be called " 'Mr. Sepulveda.' "  After they told each other to have a nice night, using each other's first names, Employee said, " 'Oh, so you want to be an asshole about this?  All right.' "  According to Employee's declaration, "I never called Sam Sisneroz an asshole.  I did mutter the term asshole as I walked away from Ed Sepulveda [*sic*]."

14

Sisneroz had car washer Greg Ojeda get the other two washers. They said they had left because Employee, their shop steward, had told them to. They assembled in another office. Fischer and Ojeda said that Employee had called Sisneroz an asshole. Employee denied it. Sisneroz told Employee he was terminating him for gross insubordination and refusal to follow instructions. They escorted Employee to his locker and had him gather his possessions and leave the premises.

Sisneroz later declared he terminated Employee solely for insubordination. He was unaware that Employee had filed any complaints about discrimination, harassment, or retaliation with any state or federal agencies.[10] According to the collective bargaining agreement between Employer and Employee's union, "Any employee may be discharged or suspended for just cause" in accordance with the procedures specified in the agreement. Reasons for immediate discharge include "theft, intoxication, use, sale or possession of illegal narcotics and gross insubordination, each having occurred on the job … ."

On September 26, 2007, Employee signed a second discrimination charge with the EEOC under penalty of perjury. At his deposition, Employee conceded it was full of inaccurate statements, such as: his original EEOC charge was filed on July 19, 2007, not

_____

[10] Employee has declared, "I personally informed Sam Sisneroz about my filing of the EEOC after I had filed the complaint, but before I was terminated." However, at his deposition, when Employee was asked "did you tell anyone that you had filed that complaint?" he answered, "I told Frank the day of, and I came back and I believe I told Temmet. I told White." When asked, "Who at UPS management did you tell you filed the charge?" he answered, "Temmet, Jon Fischer, Frank." He did not name Sisneroz either time.

Employee's declaration also claims he notified Chuck Andrews, the union business agent, and Bill Cooper, a corporate labor manager in Atlanta, of his EEOC complaint.

15

August 16, 2007; Sisneroz notified him well before August 24, 2007 that his day shift position was eliminated; he went out on sick leave on August 16, not August 27, 2007.

The trial court granted Employer's request for judicial notice of the December 2008 outcome of a grievance that Employee's union filed over his termination. The arbitrator decided that "[t]he discharge decision in this case was a snap decision which requires, and has been given, careful scrutiny but this record requires that it be upheld as for just cause. The Grievant [w]as a long-term employee and a Steward who either knew or should have known of the consequences of his actions could result in his discharge notwithstanding his longevity."[11] The San Francisco Superior Court granted Employer's petition to confirm this award on February 15, 2012.

## III. ANALYSIS

### A. STANDARD OF REVIEW

"A defendant or cross-defendant [seeking summary judgment] has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. (§ 437c, subd. (p)(2).) A summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court ... ." (§ 437c, subd. (c).)

---

[11] Employee declared that the arbitrator fell asleep during his testimony.

16

"Because entitlement to a summary judgment presents questions of law, on appeal we independently review all the evidence set forth in the motion and opposition except that to which an objection was expressly sustained." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1522–1523 (*McGrory*).)

## B. EVIDENCE OF HARASSMENT OR A HOSTILE ENVIRONMENT

Most of Employee's causes of action, the second through fifth, are premised on Byron Smith's workplace harassment and Employer's tolerance of a hostile work environment.

The California Fair Employment and Housing Act (FEHA) makes it "an unlawful employment practice" for an employer to discriminate against a person "in compensation or in terms, conditions, or privileges of employment" because of the person's "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status … ." (Gov. Code, § 12940, subd. (a).) It is also an unlawful employment practice for an employer "to harass an employee" because of the same characteristics. (*Id.* at subd. (j)(1).) "Harassment of an employee … shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. … An entity shall take all reasonable steps to prevent harassment from occurring." (*Ibid.*) The anti-harassment provisions were added in 1984. (Stats. 1984, ch. 1754, § 2, pp. 6405–6406.)

Title VII of the federal Civil Rights Act does not expressly prohibit harassment, but it proscribes "an unlawful employment practice for an employer" "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin … ." (42 U.S.C.A. § 2000e-2, subd. (a)(1).) Courts have determined that workplace harassment based on these characteristics is a form of discrimination.

(*Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57, 65 (*Vinson*).) "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." (*Id.* at p. 66; see Annot., What Constitutes Racial Harassment in Employment Violative of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.) (1999) 156 A.L.R. Fed. 1.)

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. (See *Rogers v. EEOC* [(5th Cir. 1971) 454 F.2d 234] at 238 ('mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII); [citation]. For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (*Vinson*, *supra*, 477 U.S. at p. 67.)

Despite differences in wording between Title VII and FEHA, both statutory schemes have the same antidiscrimination objectives and public policy purposes, so California courts often seek guidance in interpreting FEHA's prohibition of harassment from federal decisions. (*Lyle v. Warner Bros. Television Productions* (2006) 38 Cal.4th 264, 278 (*Lyle*).)

The elements of a harassment claim have been developed mostly in cases alleging sexual harassment. Among the elements are that, due to a protected characteristic, the employee was subject to harassment that was "severe enough or sufficiently pervasive to alter the conditions of her employment and create a hostile or abusive work environment." (*Lyle*, *supra*, 38 Cal. 4th at p. 283; italics omitted.) "To be actionable, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" (*Id.* at p. 284.)

18

"With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature. ([Citations]; accord, *Smith v. Northwest Financial Acceptance, Inc.* (10th Cir. 1997) 129 F.3d 1408, 1414 ['isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct'].) That is, when the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions. [Citations.]" (*Lyle*, *supra*, 38 Cal.4th at pp. 283–284.)

The same principles apply when alleged harassment is based on race or national origin. (*Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 464–465; *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 877 (*Thompson*); see *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130–131, 137 [plurality].) This court has explained in *Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 951–952: "Whether the conduct of the alleged harassers was sufficiently severe or pervasive to create a hostile or abusive working environment depends on the totality of the circumstances. ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citations.] ' "Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct [that] a reasonable person in the plaintiff's position would find severely hostile or abusive." ' [Citations.] As in sex-based harassment claims, '[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's [fn. omitted] work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or she] was actually offended.' [Citations.]"

It is evident from Employee's deposition that he and co-worker Byron Smith did not get along at work. However, Employee's recollections of their working relationship fall short of establishing any kind of pervasive or severe harassment based on Employee's race or national origin. By Employee's own account, Smith was his sole harasser. Employee has described two or three comments by Smith disparaging Puerto Ricans during the 10 years they both washed cars on the night shift before Employee got a day shift position in 2001. In any event, his complaint is not based on that earlier period of work.

Their personality conflict resumed when Smith also got a day shift position in October 2006. Employee's EEOC complaint of August 2007 alleged that Smith made frequent derogatory remarks about Employee's race and national origin between October and December 8, 2006. However, at his deposition, Employee claimed that Smith's comments subsided in early October when Employee shut Smith down for calling him "Precious." He acknowledged that two weeks after they began working together, their positions changed so that they did not work together again until the last week of November and the first week of December 2006, when Employee took an extended medical leave for knee surgery. Employee recalled complaining about Smith during that period for claiming he was privileged as a black man and he did not recall Smith making any racial slur about Employee during that time period.

Employee's declaration in opposition to the summary judgment motion paints a picture of more frequent ethnic epithets by Smith in late 2006 than does Employee's deposition. A summary judgment motion will ordinarily be denied when triable factual issues appear. However, "a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12; *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 861–863 .) "[W]hen discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be

20

tried," such an admission is entitled to special deference. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21)*Id.* at pp. 21–22.) To the extent Employee attempts to create a triable issue by a declaration which contradicts his April 2011 deposition, we will disregard the statements in the declaration.

Before Employee returned to work in July 2007, he successfully arranged with Leong to have the day washers' labor divided to keep Smith away from him. They stayed apart for two weeks. When Smith entered his work area, Employee complained to Leong, who told Smith to keep to his own area. Employee refused to attend a meeting on July 19, 2007, that Leong arranged to resolve their differences. Smith was again told at that meeting to stay in his own work area. Employee and Smith worked together about two more weeks before Employee was told on August 9 to report to the night shift because the third day washer position had been eliminated. Employee failed to recall a single racial slur between his return to work on July 9, 2007, and his transfer to the night shift one month later.

Even if we accept for the sake of discussion Employee's opinion that his coworker Smith was biased against Puerto Ricans, Employee at his deposition was able to recall only a handful of ethnic epithets by Smith reflecting this bias during the first 10 or so years they both worked on the night shift until 2001. At his deposition Employee did not recall a single ethnic slur when they resumed working together five years later on the day shift for the first two weeks of October 2006 and the last week of November and the first week of December 2006, and Employee did not mention a single racial slur when they worked together for a month after Employee returned to work on July 9, 2007.

While Employee detailed a personality conflict with his coworker at his deposition, we conclude as a matter of law that he did not describe a work atmosphere involving either severe or pervasive harassment by Smith based on Employee's Hispanic race or Puerto Rican origin. (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1378–1379 [no triable issue that female African-American

21

prison guard suffered severe or pervasive harassment based on race or sex]; *Thompson*, *supra*, 186 Cal.App.4th 860, 878 [no triable issue that white male police officer was subjected to severe or pervasive harassment based on his advocacy of African-American coworkers].)

In view of our conclusion that there is no triable issue regarding a severe or pervasive hostile work environment, we do not reach the trial court's further conclusion that Employer "took prompt and reasonable action upon receiving [Employee's] complaints about his co-worker, Byron Smith." The antiharassment statute requires employers to respond promptly and reasonably to complaints of harassment *on a prohibited basis*. "[L]ike Title VII, the FEHA is 'not a "civility code" and [is] not designed to rid the workplace of vulgarity'" (*Lyle*, *supra*, 38 Cal.4th 264, 295), personality conflicts (*Palesch v. Missouri Com'n on Human Rights* (8th Cir. 2000) 233 F.3d 560, 567; *Vore v. Indiana Bell Telephone Co., Inc.* (7th Cir. 1994) 32 F.3d 1161, 1162), loudness, or braggadocio. There can be no failure to prevent harassment or discrimination in the absence of harassment or discrimination. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.)

## C. REASONS FOR EMPLOYEE'S SHIFT CHANGE AND TERMINATION

Employee's remaining causes of action, the first and the fourth, alleged that Employer changed Employee's work schedule back to the night shift and terminated him in retaliation for his complaining of discrimination to the EEOC.

"FEHA makes it unlawful for an employer or other person to 'discharge ... or otherwise discriminate against any person because the person has opposed any practices forbidden under this part.' (Gov. Code, § 12940, subd. (h).) A violation of this prohibition occurs when the employer takes harmful action against an employee in retaliation for the latter's engaging in a protected activity." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987.)

22

To adapt what this court said in *McGrory*, *supra*, 212 Cal.App.4th 1510 about an alleged discriminatory discharge, "The ultimate issue when [an adverse, retaliatory employment action] is alleged is what were the employer's true reasons for [the adverse action]. (*Guz* [*v. Bechtel National, Inc.* (2000)] 24 Cal.4th 317, 358 ['the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*']; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715 (*Mamou*) ['The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus.'].)" (*McGrory*, *supra*, 212 Cal.App.4th at p. 1524.)

On appeal Employee claims that the trial court improperly shifted the burden to him without requiring Employer to carry its burden. We conclude the burden to establish a triable issue was appropriately shifted to Employee after Employer met its burden on this issue. Employer's motion documented legitimate and nondiscriminatory reasons for eliminating the third day shift car washer position and for terminating Employee. Sisneroz declared that he was prompted to look into the need for a third day car washer by Smith's complaints about not having enough work after Employee returned to work in July 2007. His inquiry revealed that an in-house study had already recommended the work could be done by two car washers. The study was included in the motion. Sisneroz and Jim Peterson jointly decided to eliminate the third position in early August 2007 without either being aware Employee had filed an EEOC complaint. As to Employee's termination, Sisneroz declared that it was based solely on Employee's gross insubordination on September 11, 2007.

"'If the employer has met its burden by showing a legitimate reason for its conduct, the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory [or retaliatory] *animus,* such that a reasonable trier of fact could

23

conclude that the employer engaged in intentional discrimination or other unlawful action.'" (*McGrory*, *supra*, 212 Cal.App.4th at p. 1529.)

"'There will seldom be "eyewitness" testimony as to the employer's mental processes.' [Citation.] 'In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).) Thus, even though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable.' [Citation.]" (*McGrory*, *supra*, 212 Cal.App.4th at p. 1529–1530; fn. omitted.)

Apparent retaliation is actionable only when there is a "causal link" between an employee's "'protected activity'" and an employer's "adverse employment action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) An "adverse employment action" is one "that materially affects the terms, conditions, or privileges of employment … ." (*Id.* at p. 1051.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable … ." (*Id.* at p. 1054.)

No change in employment conditions qualifies as actionable retaliation if it was made in ignorance of the employee having engaged in protected activity. "'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.'" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 (*Morgan*).)

As this court explained in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, when a corporate decision is made to change an employee's working

conditions, "ignorance of a worker's protected activities or status does not afford a categorical defense unless it extends to *all* corporate actors who contributed materially to an adverse employment decision." (*Id.* at p. 109.) That decision reversed an employer's summary judgment. A male grocery store clerk who had complained about the sexual harassment of female coworkers was terminated by his employer's district manager. (*Id.* at pp. 100–101, 105.) It was undisputed that the district manager was unaware of the employee's harassment complaints. (*Id.* at pp. 107, 110.) However, *Reeves* concluded that this was an insufficient showing of ignorance under the following circumstances. "[I]t is clear that [district manager] Hollis was not the only actor who materially contributed to plaintiff's discharge. Judging from her deposition testimony, her decision really amounted to little more than the ratification of [a store security officer's] recommendation, which was itself the penultimate event in a chain commencing with a report to [the store manager] Demarest from night manager Juarez, followed by Demarest's referral to Safeway's security department, which produced a debatably evenhanded 'investigation' by [security officer] Harrison [ ], which concluded with the recommendation adopted by Hollis." (*Id.* at p. 110.) "[T]he evidence presents ample basis for finding retaliatory motives and conduct on the part of plaintiff's unquestioned supervisor, Demarest." (*Id.* at p. 117.) There was no "direct evidence that [Harrison] acted without retaliatory motive." (*Id.* at p. 118.) The employer did not "attempt to show that Harrison acted for honestly held nondiscriminatory reasons, and even if it had, the evidence supports an inference that Harrison acted as a sort of institutionalized 'cat's paw' to effectuate the retaliatory intentions of supervisors by substantiating their claims of misconduct and presenting the claims, thus reinforced, to upper management." (*Id.* at p. 119.)

## 1. Change in Shifts

*Daniels v. United Parcel Service, Inc.* (10th Cir. 2012) 701 F.3d 620, 635 stated: "We acknowledge that many employees would find working the day shift preferable to

the night shift. But this does not establish an assignment to the night shift is sufficiently material to constitute a *significant* change in employment status or responsibilities." The employee in that case was a dispatcher.

A change in work shifts may qualify as an adverse employment action if it has a detrimental impact on an employee's pay, benefits, working conditions, location, free time, or other conditions of employment. (*Mondzelewski v. Pathmark Stores, Inc.* (3d Cir. 1998) 162 F.3d 778, 787–788, and cases there cited.) We need not determine whether there was a triable issue about Employee's transfer to the night shift involving a significant change in his working conditions, because there is another reason it does not amount to retaliation.

If we consider the EEOC questionnaire completed on July 19, 2007, to be a charge and not merely an informational document leading to the formal charge filed August 16, 2007, it still would not contradict the declarations of feeder manager Sisneroz and transportation division manager Peterson that each was unaware of Employee having filed an EEOC charge when they jointly decided to eliminate the third day shift car washer position effective August 13, 2007. Employee's declaration concedes that Peterson was never notified of any complaint, but asserts that he personally notified Sisneroz of his EEOC complaint before he was terminated, not necessarily before the decision to eliminate the third position. Here again, Employee cannot create a triable issue by declaring information that is inconsistent with his earlier testimony. At his deposition, Employee never claimed to have notified Sisneroz of filing an EEOC complaint, instead identifying other coworkers and supervisors as those he notified.

On appeal Employee points out that Temmet Oliver, Jr. was aware on July 23, 2007 that Employee said he was "going to the EEOC." Employee asserts that "the fact that Temmet Oliver clearly knew about the EEOC complaint imputes notice on [Employer] as an entity." This is not the law. Employee does not provide any evidence that Oliver mentioned this claim to Sisneroz or Peterson or that Oliver was at all involved

in the decision to eliminate the third day car washer position. It is not enough to create a triable issue that some of Employer's staff knew of Employee's EEOC complaint unless there is evidence supporting a reasonable inference that a person with such knowledge materially contributed to the decision to eliminate the position. (*Morgan*, *supra*, 88 Cal.App.4th 52, 70–74 [no evidence that those who were aware of employee's grievance were involved in decision to not rehire him].) There is no such evidence here.

Employee asserts, "The record leaves no room to doubt the fact that the plaintiff's position was eliminated not on the basis of a time study or any other objective basis, but rather because management colluded with Smith by eliminating the plaintiff's position on the day shift." This contradicts Employee's deposition statement that there was a time study of his work before the third position was eliminated. To contradict this statement, his brief relies on what he claims Chuck Andrew said during a telephone interview on February 11, 2009, with an EEOC agent.[12] What Andrew said was that he believed management took Smith's word about a lack of available work and did not do a time study. "But I am not positive, they might have done one, I just don't know." Andrew also said he was not at his office during the call and did not have his files in front of him. Andrew's uncorroborated belief does not contradict Employee's direct recollection.

It is true that Sisneroz looked into the need for three day car washers after Smith complained about not having enough work. This does not establish that Smith, a car

---

[12] Exhibit E in Employee's appendix is entitled "Chuck Andrew Interview with EEOC." It appears to be some typed notes by an unidentified person of a telephone call between that person and Andrew. We have noted previously that Employer objected in the trial court to Employee's reliance on unauthenticated documents that had not been provided to Employer and that the trial court did not rule on Employer's objections. On appeal Employer objects to this interview exhibit in part as unauthenticated, hearsay, and lacking foundation. Again, even if we were to overlook these objections, the passage cited by Employee does not assist him.

27

washer himself, was at all involved in making the decision to eliminate the third position. Smith's complaint in July 2007 corroborated a January 2007 efficiency study that determined the day car wash shift required 11.14 total hours of work.

Employee has presented no evidence giving rise to a reasonable inference that the decision by Sisneroz and Peterson to eliminate the third day shift car wash position, which resulted in Employee's return to the night shift, was made or influenced by anyone who was aware that Employee had filed an EEOC charge on July 19, 2007. Therefore, no claim of actionable retaliation can be predicated on Employee's elimination of the third day shift car wash position. (*Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 217.)

### 2. Termination

As to the reasons for Employee's termination on September 11, 2007, when Sisneroz terminated Employee he said it was due to Employee's gross insubordination. Sisneroz has subsequently declared that was his sole reason for discharging Employee and he was still unaware at the time of termination of Employee's EEOC complaint.

Employee does not dispute that gross insubordination is a legitimate reason for termination, but he contends that his termination was really motivated by retaliation for his EEOC complaint. However, while time passed between the decision to eliminate the third day washer position in early August 2007 and Employee's termination on September 11, 2007, Employee has presented no evidence giving rise to an inference that, in this interim, anyone he claims to have informed of his EEOC complaint had relayed the information to Sisneroz prior to his termination or that any one of those individuals materially contributed to the termination decision. There is no evidence that anyone other than Sisneroz decided to terminate Employee.

In any event, an employee's involvement in a protected activity like filing an administrative complaint about discrimination does not insulate that employee from an adverse action for violating workplace rules. (*Joaquin v. City of Los Angeles* (2012)

28

202 Cal.App.4th 1207, 1223, 1225 [false report of harassment may justify termination]; cf. *McGrory*, *supra*, 212 Cal.App.4th 1510, 1528 [FEHA "does not shield an employee against termination or lesser discipline for either lying or withholding information during an employer's internal investigation of a discrimination claim."].)  As Employee acknowledges being grossly insubordinate immediately preceding his termination, even if Sisneroz was aware of the EEOC complaint, he was justified in terminating Employee for gross insubordination as long as he did not also have an improper mixed motive like retaliation.  "Abusive or profane language coupled with defiant conduct or demeanor justify an employee's discharge on the ground of insubordination" even when the employee has participated in protected activity.  (*Dunham v. Brock* (5th Cir. 1986) 794 F.2d 1037, 1040–1041.)  Employee has presented no evidence giving rise to an inference that Sisneroz was thinking of Employee's EEOC complaint at the time of his discharge for insubordination.  What is lacking is evidence of a causal nexus between Employee's EEOC complaint and his discharge by Sisneroz.  (*Royal Packing Co. v. Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835.)  We conclude that Employee has identified no triable issue on either claim of retaliation.

## D. DISCRIMINATION

Employee's brief states, "Central to the instant litigation, is the fact that the plaintiff suffered because the defendant neglected to discipline Byron Smith, an African American, for fear that he would use the race card."  He also asserts that his argument "is not based on Byron Smith making racial slurs to [Employee], but rather the company failing to effectively discipline Byron Smith for fear that he would use the 'race card.'"  Employer asserts that this theory is unavailable to Employee because it was not articulated in the trial court.  Employee has not filed a reply brief.  We recognize that no separate cause of action was predicated on Employee's claim that Employer had failed to discipline Smith for fear he would "'use the race card,'" but this allegation was included

in Employee's complaint as the reason given for Employer's inaction on Employee's harassment complaints.  We will consider the merits of this claim.

Employee is attempting to make out a claim of what is sometimes called reverse discrimination, in this case that Employer favored an employee over others for having a characteristic Employer is prohibited from discriminating against.  (See Annot., What Constitutes Reverse or Majority Race or National Origin Discrimination Violative of Federal Constitution or Statutes – Private Employment Cases (1998) 150 A.L.R. Fed. 1.)  This contention does not appear to challenge Employee's transfer or termination, but instead how Employer responded to Employee's complaints about Smith.  To make out a claim of reverse discrimination, an employee must establish that he suffered an adverse employment action and that others were treated more favorably as a result of the employer's discrimination against the majority to which the employee belongs.  (*Mastro v. Potomac Elec. Power Co.* (D.C. Cir. 2006) 447 F.3d 843, 851; *Good v. University of Chicago Medical Center* (7th Cir. 2012) 673 F.3d 670, 678–679.)

Employee relies on *Ricci v. DeStefano* (2009) 557 U.S. 557 (*Ricci*).  In that case, a city administered an examination to determine which firefighters to promote to lieutenant or captain.  (*Id.* at p. 562.)  When white candidates outperformed minority candidates on the examination, there was a public debate about the validity of the exam, which resulted in the city throwing out the exam results and then a lawsuit by white and Hispanic firefighters likely to have been promoted.  (*Ibid.*)  The city argued that it acted to avoid a disparate impact lawsuit.  (*Id.* at p. 575.)  *Ricci* explained how the Civil Rights Act has been interpreted to prohibit not only disparate treatment of those with a protected characteristic, such as race or national origin, but also an employer's facially neutral practices that have disparate impact on races.  (*Id.* at pp. 577–578.)  The issue on appeal was "whether the purpose to avoid disparate-impact liability excuses what otherwise would be prohibited disparate-treatment discrimination."  (*Id.* at p. 580.)  The court held as a matter of statutory construction, "under Title VII, before an employer can engage in

30

intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." (*Id.* at p. 585.)

Implicit in *Ricci* is that some circumstances justify discriminating in favor of a previously disadvantaged minority. Not every affirmative action by an employer to remedy past discrimination is prohibited by Title VII. The federal Civil Rights Act's prohibition of "racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans." (*United Steelworkers of America, AFL-CIO-CLC v. Weber* (1979) 443 U.S. 193, 208.)

Employee compares himself to the white and Hispanic firefighters in *Ricci*, saying that he "experienced detrimental treatment because he is not black." The facts before us do not fit a recognized pattern of reverse discrimination. The typical reverse employment discrimination case, as in *Ricci*, involves an employer favoring one kind of candidate or employee in hiring or job advancement based on his or her minority status over others who are equally qualified. In *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, this court confronted such a claim on appeal from a summary judgment, that the decision by a television station not to renew the contract of a white male news anchor "was motivated by the desire to place an African-American in the 5:00 p.m. anchor position." (*Id.* at p. 1004.)

We do not understand Employee to be making this kind of reverse discrimination claim, that Smith was given job opportunities at Employee's expense. As far as any changes in Employee's duties as a car washer to accommodate Smith's injury in mid-October 2006 and Smith's return to health at the end of November 2006, "[p]roof of an adverse employment action requires a ' "tangible change in duties or working conditions that constitute a material disadvantage." ' " (*Phillips v. Collings* (8th Cir. 2001) 256 F.3d 843, 848; cf. *Griffin v. Potter* (7th Cir. 2004) 356 F.3d 824, 830 ["the transfer –

31

which involved no material change in duties or benefits – was not an adverse employment action"].) There is virtually no evidence of what duties changed for Employee in mid-October or late November 2006 and there is no evidence that any change amounted to a material disadvantage to Employee.

If we assume for the sake of discussion that the day shift offered car washers a more favorable working climate than the night shift, we do not understand Employee to contend that it was Smith's race that prevented Smith from being transferred to the night shift instead of Employee when the third day washer position was eliminated in August 2007. Employee has acknowledged that he was reassigned in accordance with the applicable collective bargaining agreement as the day washer with the least seniority. Any change in Employee's duties or working conditions when the third position was eliminated was attributable to Smith's seniority, not his race.

Another type of reverse discrimination is when minority employees receive a lesser punishment than other employees for the same conduct. This court confronted such a claim in *McGrory*, *supra*, 212 Cal.App.4th 1510, when a white male employee claimed that he was terminated for the same misconduct for which a female employee was not disciplined based on the recommendation of a biased female investigator. We explained, "To establish discrimination based on disparate discipline, it must appear 'that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.'" (*Id.* at p. 1535.)

We do not understand Employee to be making such a claim, that he was transferred or terminated for conduct that Smith got away with. He has cited no example of another employee who engaged in conduct similar to Smith's who was disciplined more strictly than Smith was disciplined. Employee instead asserts that a "jury could have found that the management of [Employer], to the detriment of [Employee], failed to discipline Byron Smith for fear that he would use the race card." Employee contends that

this failure to discipline "is in and of itself sufficient to constitute harassment under" FEHA. Employee misconstrues the nature of harassment and discrimination claims by equating favorable treatment of Smith with unfavorable treatment of Employee. A failure to act on Employee's complaints because Smith was black does not necessarily establish any prejudice against Employee because of his own race or national origin.

Nor is there a triable issue whether Employer's alleged failure to discipline Smith was an employment action adverse to Employee. It was Smith, not Employer, who was needling Employee. Mistreatment by a nonsupervisory coworker is not an adverse action by the employer. (*Moisant v. Air Midwest, Inc.* (8th Cir. 2002) 291 F.3d 1028, 1032.) When a coworker's mistreatment has a prohibited basis, an employer that should know of the harassment may be liable for failing to take immediate and appropriate corrective action. However, it is not an adverse employment action by the employer for a coworker to be uncivil absent a prohibited motive, and it is not an adverse employment action for the employer to fail to correct such behavior. "[O]rdinary workplace strife … cannot constitute adverse employment action." (*Matvia v. Bald Head Island Management, Inc.* (4th Cir. 2001) 259 F.3d 261, 272.) "Although Plaintiff might receive some personal satisfaction or vindication from punishment of [his] perceived nemesis, [his] conditions of employment were not materially affected by the lack of discipline." (*Wells v. Colorado Dept. of Transp.* (10th Cir. 2003) 325 F.3d 1205, 1215.)

Under Title VII and FEHA, an employer has three primary obligations: to not discriminate against employees on a prohibited basis, to eliminate discriminatory harassment by coworkers, and to not punish an employee for complaining about discrimination by coworkers or by the employer. We have already concluded that there is no triable issue concerning whether Smith's harassment of Employee was severe or pervasive enough to create a hostile work environment and whether Employer transferred or terminated Employee in retaliation for filing an EEOC charge. Absent evidence giving rise to a reasonable inference that Employer's alleged failure to discipline Smith was

33

motivated by Employee's race or national origin, we now conclude there is no triable issue of discrimination against Employee in how Employer handled Employee's complaints about Smith.

### E. COSTS

Under a heading complaining of the trial court's award of sanctions against Employee, his only argument is that "the trial judge's decision to award $6,562 in costs" to Employer is an abuse of discretion because Employer's summary judgment motion should not have been granted. We have found no error in granting the motion. Employee also requests "[d]ismissal of all trial court sanctions and/or cost awarded" to Employer. Employee presents no reasoned argument challenging any discovery sanctions awarded to Employer.

## IV. DISPOSITION

The judgment and costs award are affirmed.

_____

Grover, J.

**I CONCUR:**


_____

Bamattre-Manoukian, Acting P.J.


**I CONCUR IN THE JUDGMENT ONLY:**


_____

Mihara, J.